M. Mark COLE, Plaintiff,

v.

CHAMPION ENTERPRISES, INC.,
Southern Showcase Housing,
Inc., Defendants.

No. 1:05CV00415.

United States District Court,
M.D. North Carolina.

July 23, 2007.

Dena Beth Langley, J. Alexander S. Barrett, Jason Benjamin Buckland, Hagan Davis Mangum Barrett Langley and Hale, PLLC, Greensboro, NC, for Plaintiff.

David C. Wright, III, Julian Hugh Wright, Jr., Pearlynn G. Houck, Robinson Bradshaw & Hinson, P.A., Charlotte, NC, Dixie Thomas Wells, James Donald Cowan, Jr., Smith Moore, L.L.P., Greensboro, NC, for Defendants.

## ORDER AND JUDGMENT

OSTEEN, District Judge.

In this proceeding, the Magistrate Judge has recommended that Defendant Champion Enterprises, Inc. and Southern Showcase Housing, Inc.'s Motion for Summary Judgment be granted and Plaintiff M. Mark Cole's Motion for Summary Judgment be denied. Plaintiff filed a timely objection to the Recommendation. Defendants Champion Enterprises, Inc. and Southern Showcase Housing, Inc. responded to Plaintiff's objections.

This court has conducted a review of the file and has determined that the Recommendation of the Magistrate Judge is appropriate and should be adopted.

For the reasons set forth in the Magistrate Judge's Recommendation of June 5, 2007,

IT IS ORDERED AND ADJUDGED that Defendant Champion Enterprises, Inc. and Southern Showcase Housing, Inc.'s Motion for Summary Judgment (Doc. No. 113) is GRANTED as to all of Plaintiff's claims and Plaintiff M. Mark Cole's Motion for Summary Judgment (Doc. No. 116) is DENIED.

IT IS FURTHER ORDERED that all other pending motions are denied as moot and this case is dismissed with prejudice.

## RECOMMENDATION BY UNITED STATES MAGISTRATE JUDGE

DIXON, United States Magistrate Judge.

This matter is before the court on a motion for summary judgment (docket no. 113) filed by Defendants Champion Enterprises, Inc. and Southern Showcase Housing, Inc. and on a motion for summary judgment (docket no. 116) filed by Plaintiff M. Mark Cole. The parties have responded to the motions and, in this posture, the matter is ripe for disposition. Furthermore, because the parties have not consented to the jurisdiction of the magistrate judge, I must address the motions by way of recommendation. For the following reasons, it will be recommended that the court grant summary judgment to Champion and Southern Showcase Housing as to all of Plaintiff Cole's claims.

### STATEMENT OF CASE AND BACKGROUND

Plaintiff M. Mark Cole filed his initial complaint against Defendants Champion Enterprises, Inc. ("Champion") and Southern Showcase Housing, Inc. ("SSH") in the

Guilford County Superior Court on April 11, 2005. Champion and SSH removed the case to this court on May 12, 2005, based on federal question jurisdiction and filed a motion to dismiss on May 19, 2005. On July 25, 2005, Cole filed an amended complaint and added two of Champion's employee benefit plans, The Champion Enterprises, Inc. Deferred Compensation Plan ("DCP") and The Champion Enterprises, Inc. Corporate Officers Stock Purchase Plan ("SPP"), as parties pursuant to 29 U.S.C. § 1132(d). Cole was for years an employee of Champion working on an at-will basis. The gist of Cole's lawsuit against Defendants is that when Champion fired him without cause in October 2004, Champion breached its contract with Cole regarding various terms of his employment and failed to pay him certain wages and benefits owed.

By previous order, the court dismissed DCP and SPP as Defendants; thus, the only remaining defendants are Champion and SSH. Furthermore, the court has dismissed certain ERISA claims as well as an unfair trade practices claim under Chapter 75 of the North Carolina statutes. The claims remaining are a claim for breach of contract/repudiation of contract, a claim under the North Carolina Wage and Hour Act, a claim for restraint of trade under Chapter 75 of the North Carolina statutes, and a claim arising under ERISA regarding an alleged oral severance package. Cole, Champion, and SSH have now moved for summary judgment on the remaining claims, and the motions have been referred to the undersigned.[1]

### UNDISPUTED FACTS AND CLAIMS

Cole is a citizen and resident of Greensboro, North Carolina (Am.Compl.¶ 1.) Defendant Champion, a housing manufactur-

er, is a Michigan corporation. (Am. Compl.¶ 2.) Defendant SSH is a North Carolina corporation that is owned by a wholly owned subsidiary of Champion. In or around January 1998, Cole was the majority shareholder and President of SSH. (*Id.* ¶ 12). Cole sold his shares of SSH to a wholly owned subsidiary of Champion and entered into an "Employment and Non–Competition Agreement" with Champion and SSH on January 8, 1998 (the "January 1998 Agreement"). (*Id.* ¶ 13 & Ex. 1.) The January 1998 Agreement stated that its terms would expire in five years and that after the initial five-year term the agreement could be extended for additional periods as may be agreed upon in writing by Cole and Champion. (*Id.* Ex. 1, ¶ 2.) The January 1998 Agreement included, among other things, terms regarding Cole's compensation amount as well as his right to a performance bonus each year during the term of the Agreement, and his right to a severance package and a performance bonus (prorated for the year in which he was terminated) in the event that he was terminated without cause. (*Id.* ¶ 4.)

Effective September 11, 1998, Champion promoted Cole to President of its retail operations, which was memorialized by a letter agreement dated September 11, 1998 (the "September 1998 Letter Agreement"). (*See* Letter Agreement, Am. Compl. Ex. 2.) The September 1998 Letter Agreement outlined in bullet-point form the basic terms of Cole's employment with Champion, including his salary and benefits, and made clear that all terms from the January 1998 Agreement remained in full force and effect. (Am. Compl.¶ 17.) As President, Retail Opera-

---

1. The only allegations against SSH concern its alleged violation of restraint of trade by attempting with Champion to enforce certain noncompetition agreements against Cole. Al-

though SSH has joined with Champion in the motion for summary judgment, I will refer primarily to Champion when addressing the parties' respective arguments.

tions, Cole was considered an "executive" officer of Champion and was subject to applicable SEC Rules regarding executive compensation and other employment terms.[2] Executive officers of public companies are generally referred to as "Rule 16(b)" officers. Cole's position as President, Retail Operations, was based in Greensboro, North Carolina. (*Id.* Ex. 2.)

In 1999, the mobile home industry faced a major economic downturn, which continued for several years. (Young Dep. 7–8, Pl.'s Ex. B–1, docket no. 119.) Champion's stock price dropped significantly, going from $30 a share in 1997 to under $2 a share in early 2003. (*Id.* 7, 10–11.) In response to the downturn, Champion closed over 300 retail locations, which Cole oversaw. As a result of the decline in stock price, Cole and other senior executives were asked in 2000 to voluntarily surrender their stock options. Champion subsequently granted Cole new stock options in separate agreements dated January 2, 2001. (Am.Compl.¶¶ 18, 22, Exs.3, 4). The stock option agreements contained identical, non-competition provisions, which stated that for two years after termination of employment, Cole could not:

> directly or indirectly ... as owner, partner, joint venturer, employee, broker, agent, principal, trustee, corporate officer, licensor, consultant, or in any capacity whatsoever, engage in, become financially interested in, or have any connection with, any business located in the United States or Canada engaged in the production, sales, financing, insuring, or marketing of manufactured

homes or the development of manufactured housing parks.

(*Id.*)

In or around April 2003, Cole met with Champion's then Chief Executive Officer, Walt Young ("Young"), and Chief Operating Officer, Philip Surles ("Surles"), in Las Vegas, Nevada to discuss Cole's concerns about his future with Champion. (Young Dep. 38–49, 112–13, Pl.'s Exs. B–1, B–3, docket no. 119; Cole Dep. 56–57, 180–87, Pl.'s Ex. D–1, docket no. 119; Surles Dep. 119–20, Pl.'s Ex. C, docket no. 119; Pl.'s Ex. 75, docket no. 122.) By then, the terms of Cole's January 1998 Agreement had expired, and Cole wanted to obtain written agreements from Young regarding the severance and equity components of his compensation. (Young Dep. 42.) Young told Cole that Champion had been able to work out similar arrangements with other executive officers in the past, but that he would need approval from Champion's Board of Directors ("the Board") to finalize the arrangement. (Young Dep. 43–44, 84–89; *see also* Pl.'s Exs. 78, 79, docket no. 122.) Young's receipt of approval from Champion's Compensation Committee and Board had not been an issue in the past. According to Cole, the parties orally agreed to a number of terms and conditions concerning Cole's continued employment and Cole consequently relied on the Agreement in continuing his employment, while expecting Champion to reduce the agreements in writing. (Am.Compl.¶¶ 29–32.) More specifically, Cole alleges that Young told him that in the event that Champion fired Cole without cause, he would (1) receive a lump sum severance payment equal to one

---

**2.** More specifically, during the time that he served as President, Retail Operations, Cole was a "named executive officer" in Champion's proxy materials, as one of the company's "four most highly compensated executive officers other than the CEO." This meant that his

compensation and any employment contract or arrangement that he had with Champion was subject to disclosure under various SEC regulations. (*See* Collins Aff. ¶ 6, docket no. 114.)

year's salary; (2) he would be released from all covenants against competition; and (3) that all forms of deferred compensation, all performance shares, stock grants, and options would fully vest and Cole could hold them until maturity. (Am. Compl.¶ 29.)

Champion terminated the employment of Young and Surles in June and July of 2003, respectively, and Albert Koch ("Koch") was subsequently appointed as Champion's Interim CEO. Early on in Koch's tenure as Interim CEO, Cole went to Koch and informed Koch about the compensation commitments that Young had agreed to. (Cole Dep. 279–80, Pl.'s Ex. D–2; Koch Dep. 26–29, 34–35, Pl.'s Ex. F–1, docket no. 119.) Koch was not willing at such an early stage in his tenure as Interim CEO to address with the Board Cole's concerns, and Cole agreed to delay final resolution until the 2004 compensation plan was rolled out for him and other Rule 16(b) officers. Due to delays, the 2004 compensation plan for Rule 16(b) officers was not finalized and disseminated until March 15, 2004. (Pl.'s Exs. 96, 97, docket no. 122.) These annual incentive compensation agreements, which were amendments to each Rule 16(b) officer's employment arrangements, were regularly sent out by letter or memorandum after approval by Champion's Board. (Pl.'s Exs. 96, 97, 176, 191, docket nos. 122 & 123.)

Cole was not pleased with certain terms of his incentive compensation arrangements because they were inconsistent with what Young promised him when they met in 2003. On or about March 25, 2004, Cole met with Koch in Detroit to discuss Cole's concerns that the March 15, 2004, incentive compensation arrangements did not address the terms agreed to by Young on behalf of Champion in April 2003. (Cole Dep. 21–25, 287–324, 327–28, Pl.'s Exs. D–1, D–2, D–3; Koch Dep. 35–36, 124–25, Pl.'s Ex. F–1, F–2; Pl.'s Exs. 105–107,

docket no. 123.) Cole was very concerned about the equity portions of his compensation being at risk in the event that Champion ever terminated his employment without cause, especially since there was a possibility that Champion might decide to exit the retail business altogether. (*Id.*; Cole Dep. 28–29, 170–71, 179–81, 184, 186–95, 196–99, 200–03, 244–45, 310–11.) Cole informed Koch of his unwillingness to continue his employment with Champion without confirmation of certain terms and that he would give Koch until March 29 to return to him an agreement that addressed Cole's concerns. (Koch Dep. 36, 52–53; Cole Dep. 290, 293.) Cole informed Koch that if they did not reach an agreement by March 29, he would no longer work for Champion.

By the conclusion of Cole's and Koch's meeting in Detroit on March 25, Koch and Cole had agreed only that Cole would be a participant in the executive severance plan that was being developed by Champion's outside compensation consultant, Edward Graskamp, and which was expected to be finalized and in place by July 2004. (Cole Dep. 72–75, 259–61.) Cole left Koch's office and flew back to Greensboro, making notes of his conversation with Koch during the flight. (Cole Dep. 57–58; Pl.'s Ex. 105, docket no. 123.) As Cole was disembarking the airplane at the Greensboro airport, he received a call on his cell phone from Koch and Collins, Champion's general counsel. According to Cole, in the telephone call, Koch and Collins proposed, and Cole agreed to, the following terms regarding Cole's compensation:

(1) Cole's salary would be increased by $20,000 to $300,000 for calendar year 2004 and would be retroactive to January 1, 2004, with the increase triggered upon Champion achieving two consecutive profitable quarters; (2) Cole would enter into a change of control agreement with Champion; (3) Champion would not

waive Cole's noncompete in the event of termination without cause, but would modify it so that in the event Champion exited its retail operations Champion would agree to allow Cole to operate at least one retail center anywhere in the United States as long as Cole operated the location as a "Champion Home Center"; and (4) Champion would protect the equity pieces of Cole's compensation, particularly any unvested portions of stock options or performance shares, by continuing to employ Cole in another capacity for the time necessary for all equity pieces to fully vest. (Cole Dep. 306–07, 321–22.) Koch informed Cole that he could not get Board approval by March 29, but that he would put the agreement on fast track and obtain Board approval swiftly. (Koch Dep. 53–54; Pl.'s Ex. 107; Cole Dep. 36, 290–93.)

Cole maintains that he remained employed with Champion in reliance on the March 2004 agreement and with the understanding that portions of the agreement were subject to the Board's approval. (Cole Aff. ¶ 59, docket no. 141.) Koch called Cole about a week later and told Cole that both Bob Anestis, Chair of Champion's Compensation Committee, and Graskamp had approved the terms of the Agreement between Cole and Koch. (Koch Dep. 37–38, 54–55; Cole Aff. ¶ 59.) At the Annual Meeting of the Board of Directors held on April 27, 2004, Koch made a presentation to the Board which included details about Cole's current employment contract and details of compensation in the event that his employment were to be terminated. Koch used a Power Point presentation to make the following recommendations to the Board for approval:

### APPROVAL REQUEST TO BOARD
- Increase Mark Cole salary by $20,000
- Salary will increase to $300,000 after two profitable quarters (versus 285,000 now)
- Give Mark an option to: Retain current restricted stock (40,000 shares) and target bonus of 80%, **or** Take restricted stock of 50,000 shares and reduce target bonus to 60%
- Give Mark a change of control agreement
- If Cole is removed as President of Retail without cause, then: He may continue as a CHC retailer with a different assignment requiring about 10 days per year. His salary would be reduced to approximately $20,000 to $30,000 per year. This will preserve Mark's existing restricted stock and option grants. Vesting would occur on targeted dates if he is still employed.

(Pl.'s Ex. 17, docket no. 122.) The redacted minutes from the annual meeting state that the Company's Compensation Committee and the Board approved Koch's proposals regarding Cole's employment terms. Specifically, the minutes state, in part, that at the meeting Koch had

outlined to the Board an approval request to make certain modifications to Mark Cole's compensation arrangement.... After discussion, both the Compensation Committee and the Board approved Mr. Koch's request and authorized him to proceed with Mr. Cole, with the understanding that the changes approved would not trigger an accounting charge based on modifications to the equity components of Mr. Cole's compensation package.

(Pl.'s Ex. 18, docket no. 122.) After the Board meeting, Koch contacted Cole and notified him that the Board had approved the terms of the March 25, 2004, agreement between Koch and Cole. (Cole Aff. ¶ 60.) Koch testified:

I believe I called Mark and told him that ... we had made a presentation along the lines that had been discussed and that we would ... turn the ball over to

John Collins to prepare a contract for his—Mark's review, and I do recall Mark saying in that conversation, I thought maybe we would move pretty quickly, but I remember Mark saying it would need to be reviewed by his advisors and I said that, you know, okay, let's get it done as quick as we can.

(Koch Dep. 88–89.) Koch then instructed Collins to memorialize the terms of the agreement approved by the Board and to provide the confirmation to Cole. (*Id.*) On May 21, 2004, Koch sent a memo to the Board indicating that Champion's legal department had sent a writing to Cole's "advisors" to "paper the deal" approved by the Board on April 27, 2004. (Pl.'s Ex. 264, docket no. 123, filed under seal.) In fact, by then Collins had still not prepared the paperwork documenting the Board's approval. On June 11, 2004, Champion's in-house counsel Jay Kreindler sent to Cole a draft document of certain employment terms that failed to embody the key components of the agreement approved by the Board on April 27, 2004. On July 20, 2004, Cole's counsel provided to Kreindler a black-lined version of Kreindler's June 11, 2004, draft. In the meantime, Champion had ended Koch's employment as Interim CEO on or about July 14, 2004, and replaced him with William C. Griffiths ("Griffiths") on or about August 1, 2004. (Am.Compl.¶ 43.) In August, Champion's legal department responded to the July 20, 2004, black-lined document, informing Cole that Champion was not willing to accept certain proposed terms in the black-lined draft. (Kreindler Dep. 111, 151–58, 175–76, Pl.'s Ex. I–1, docket no. 119; Pl.'s Exs. 100–01, docket no. 123.) For the remainder of August, the parties negotiated back and forth through telephone and e-mail over various terms of Cole's employment without reaching a written agreement.

In September 2004, Griffiths announced to Cole and other managers of Champion Retail that Champion needed to exit or sell its retail business because retail was neither Champion's core business nor "a fit for Champion." (Am.Compl.¶ 44.) Following this announcement, Champion and SSH proposed that Cole purchase certain assets of SSH. In the ensuing discussions and negotiations, Champion and SSH sought to extract concessions from Cole as a condition to the sale of SSH assets concerning his entitlement to salary, bonus, performance shares, stock options, and other benefits of his employment. (Am. Compl.¶ 45.) On September 30, 2004, Cole's assistant faxed a "letter of intent" to Champion for Champion's review. (Collins Aff. ¶ 45, docket no. 114.) The letter of intent addressed terms relating to many of the severance, noncompete, and benefits issues that had been the subject of negotiations between Cole's counsel and Champion's counsel since June 2004. On or about October 15, 2004, Champion and SSH gave Cole an ultimatum to purchase certain SSH assets on terms requiring him to relinquish certain benefits; Cole declined. (Am.Compl.¶ 46.)

Champion terminated Cole's employment without cause on or about October 18, 2004. (Am.Compl.¶ 47.) At the time of his termination, Champion's human resource officers presented Cole with a separation agreement that would have required Cole to release Champion from all obligations, including all of the alleged obligations under Cole's agreement with Koch that the Board approved on April 27, 2004, in exchange for one year's salary. Cole did not sign the separation agreement. Cole notified Champion on or about October 28, 2004, that he was electing to be employed as a special assistant to Champion's Vice President of Marketing pursuant to the March 2004 Agreement. (Am. Compl.¶ 48, Ex. 5.) By letter dated November 2, 2004, Griffiths wrote back to Cole and told him that there was never an agreement between Cole and Champion.

(Am.Compl.¶ 49, Ex. 6.) Griffiths also refused to employ Cole as a special assistant to Champion's Vice President of Marketing, and confirmed Cole's termination date. Cole contends that although several promising opportunities in the manufacturing industry were presented to him during the two years after his termination of employment, he abided by the terms of the non-compete agreements and he stayed out of the manufactured housing industry. (Cole Aff. ¶¶ 91–93.) Cole maintains that he lost various investment opportunities due to Champion's stated position that it intended to enforce the non-competition agreements.

On the parties' motions for summary judgment, Cole contends: (1) that Champion violated the North Carolina Wage and Hour Act by failing to pay him various entitled compensation; (2) that Champion breached its contract to pay him various entitled compensation; (3) that Champion breached/repudiated its contract to hire and employ him as a special assistant to the Vice President of Marketing until the complete vesting of his benefits, following the termination of his employment without cause; (4) that the covenants not to compete from the 2001 stock option agreements are invalid and unenforceable; (5) that Champion and SSH's attempts to enforce the covenants not to compete constitute illegal restraints of trade for which Cole is entitled to recover treble damages under N.C. GEN.STAT. § 75–1; and (6) that Champion violated ERISA by failing to pay him what was due under an oral severance plan agreement.

### STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED.R.CIV.P. 56(e)).

In making a determination on a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Va.,* 67 F.3d 53, 56 (4th Cir.1995). Mere allegations and denials, however, are insufficient to establish a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251, 106 S.Ct. 2505 (citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex,* 477 U.S. at 331, 106 S.Ct. 2548 (Brennan, J., dissenting). "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. With these principles

in mind, the court will address the motions for summary judgment.

## DISCUSSION

### A. Whether Cole is Entitled to Recover on his Claims for Breach of Contract, Repudiation of Contract, and for Unpaid Wages under the North Carolina Wage and Hour Act

Cole claims that Champion violated the North Carolina Wage and Hour Act and breached and repudiated a contract by failing to pay various entitled compensation owed to Cole. Since the Wage and Hour Act claim and the breach of contract/repudiation of contract claim are based on the same alleged facts, I will analyze these claims together. The court must first decide, however, which state's law applies to the breach of contract claim. In deciding non-federal questions, the court must apply North Carolina conflict of laws analysis to Cole's contract claims. *Eli Research, Inc. v. United Commc'ns Group, LLC*, 312 F.Supp.2d 748, 754 (M.D.N.C.2004). Generally, North Carolina applies the doctrine of lex loci contractus, which means a contract is formed in the place at which the last act was done by either of the parties essential to a meeting of the minds. *Id.* Cole argues that the last act essential to the meeting of the minds was Cole's acceptance of the terms of the alleged contract between him and Koch at the Greensboro, North Carolina airport on March 25, 2004. Champion argues, on the other hand, that Michigan law controls because the Board had to give final approval to any compensation package given to Cole and the Board would have made that decision in Michigan. I agree with Champion that Michigan law should control because the parties would not be bound by any terms of an alleged contract until the Board gave its approval, and the Board gave its approval in Michigan. In any event, there is no substantive difference in the law of contracts between North Carolina and Michigan. Thus, I will refer to both Michigan and North Carolina law in analyzing the breach of contract claims.

The elements of a claim for breach of contract are the existence of a valid contract and a breach of the terms of that contract. *See Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C.App. 365, 369, 618 S.E.2d 867, 870 (2005). The intentions of the parties may be discerned from both their writings and their actions. *Arndt v. First Union Nat'l Bank*, 170 N.C.App. 518, 522, 613 S.E.2d 274, 278 (2005). To be enforceable, the terms of a contract must be sufficiently definite and certain. *Lassiter v. Bank of N.C.*, 146 N.C.App. 264, 269, 551 S.E.2d 920, 923 (2001). A contract leaving material portions open for future agreement is nugatory and void for indefiniteness. *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974). In addition to setting forth its terms with the requisite level of certainty, to be enforceable a contract must contain an expression of mutual assent, or a meeting of the minds. *See Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F.Supp.2d 386, 400 (M.D.N.C.2003) ("There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense."). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 194 Mich.App. 543, 487 N.W.2d 499, 503 (Mich. Ct.App.1992).

 Furthermore, where the evidence is sufficient to support plaintiff's contention that a definite oral agreement was made by the parties, the contract is complete even though the parties contemplated that they would ultimately reduce the agreement to writing. *Williams v. Jones*, 322 N.C. 42, 52, 366 S.E.2d 433, 440

(1988); *see also Dow Chem. Co. v. Gen. Elec. Co.*, No. 04–10275–BC, 2005 WL 1862418, at *32 (E.D.Mich. Aug. 4, 2005) (stating that a binding oral contract may exist even though the parties intend to reduce their agreement to a fully executed document). Nevertheless, if it appears that the parties are merely negotiating to see if they can agree upon terms, and that the writing is to be a contract, then there is no contract until the writing is executed. *Key Motorsports, Inc. v. Speedvision Network, L.L.C.*, 40 F.Supp.2d 344, 347 (M.D.N.C.1999). "If the parties intend to signal their agreement only by the execution of a written document and do not intend to be bound unless and until all parties sign, no amount of negotiation or oral agreement, no matter how specific, will result in the formation of a binding contract." *Dow Chem. Co.*, 2005 WL 1862418, at *32; *see also Manon v. Corp. Solutions, LLC*, No. 04–73649, 2005 WL 3534765, at *6 (E.D.Mich. Dec. 23, 2005) (finding facts that parties worked on preparing final written documents and scheduled a closing to execute those documents demonstrated that no enforceable contract was entered into absent execution of a mutually agreeable and definitive written agreement).[3]

█ The North Carolina Wage and Hour Act, N.C. GEN.STAT. § 95–25.1 et seq. ("Wage and Hour Act"), provides a private right of action to employees for recovery of unpaid wages owed, interest at the legal rate set forth in N.C. GEN.STAT. § 24–1, liquidated damages, and attorneys fees. N.C. GEN.STAT. § 95–25.22. The Wage and Hour Act defines "Wages" as

compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, commission, or other basis of calculation.... For the purposes of G.S. 95–25.6 through G.S. 95–25.13 'wage' includes sick pay, vacation pay, severance pay, commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments.

N.C. GEN.STAT. § 95–25.2(16). Moreover, section 95–25.7 provides:

Employees whose employment is discontinued for any reason shall be paid all wages due on or before the next regular payday either through the regular pay channels or by mail if requested by the employee. Wages based on bonuses, commissions or other forms of calculation shall be paid on the first regular payday after the amount becomes calculable when a separation occurs. Such wages may not be forfeited unless the employee has been notified in accordance with G.S. 95–25.13 of the employer's policy or practice which results in forfeiture. Employees not so notified are not subject to such loss or forfeiture.

N.C. GEN.STAT. § 95–25.7.

Cole contends that Koch's presentation to Champion's Board on April 27, 2004, made clear that the request sought was designed to address Cole's concerns about his compensation and benefits in the event he was terminated without cause. In his summary judgment motion, Cole asserts that Koch sought and received Board approval regarding Cole's "wages" as follows

---

**3.** Furthermore, under Michigan law, in determining whether the parties intended to require a written document in order for a contract to be binding, a court applies the following factors: (1) whether the contract is of that class which are usually found to be in writing; (2) whether it is of such nature as to need a formal writing for its full expression; (3) whether it has few or many details; (4) whether the amount involved is large or small; (5) whether it is a common or unusual contract; and (6) whether the negotiations themselves indicate that a written draft is contemplated as a final conclusion of the negotiations. *Dow Chem. Co.*, 2005 WL 1862418, at *33.

and that Champion has failed to pay Cole these wages due:

1. The Board agreed to increase Cole's grant of restricted shares [performance shares] to 50,000 shares in 2004 if Cole reduced his target bonus to 60%.

2. The Board agreed to protect Cole's "financial opportunity loss" of restricted shares [performance shares] and stock options if he was terminated without cause by employing him "in a different capacity" to prevent forfeiture of Cole's benefits and compensation.

3. The Board agreed to grant Cole a $20,000 salary increase to $300,000 after two profitable quarters.[4]

(Pl.'s Br. Supp. Summ. J. at 19–20.) First, with regard to the promise to continue to employ Cole to protect his equity interests, according to Cole, per the Agreement with Champion, in the event Cole was terminated without cause as President of Champion Retail, the equity pieces of his compensation would be due and payable to him on the targeted vesting dates, in order to "give Mark protection against economic equity value loss...." (Pl.'s Ex. 17, docket no. 122.) Cole would continue with Champion in a different capacity for "about 10 days a year" as a mechanism designed to protect Cole's equity interests without having to amend the following equity plans: Champion's Deferred Compensation Plan; Champion's Corporate Officer's Stock Purchase Plan; Champion's 1995 Stock Option Plans (per the 2001 January and September Stock Option Agreements) and the 2003/2004 Performance Share and Incentive Bonus grants. Thus, according to Cole, Champion entered into an Agreement to employ Cole for a definite term—until his equity pieces had vested at their targeted vesting dates. The latest equity component to vest was Cole's 2004 performance shares, which vested when Champion announced its 2006 earnings on a specified date in 2007. Cole contends that Champion cannot repudiate the contract simply because it stalled and failed to "paper" the deal, and Cole argues that all of the components of his compensation were promised "wages" within the meaning of N.C. GEN.STAT. § 95–25.2(16). Furthermore, Cole contends that the letter from CEO Griffiths to Cole in response to Cole's election to remain employed by Champion in a different capacity constituted a retroactive notice of a change in Cole's compensation, which is expressly prohibited by N.C. GEN.STAT. § 95–25.13.3. *See Hamilton v. Memorex Telex Corp.*, 118 N.C.App. 1, 11, 454 S.E.2d 278, 283 (1995) (stating that once an employee meets conditions for the receipt of benefits, an employer may not rescind).

Cole further contends that Champion tied Cole's 2004 bonus to the increase in Cole's 2004 performance share grant. According to Cole, Champion calculated Cole's 2004 prorated bonus following his termination without cause, but refused to pay him the amounts owed. (Collins 30(b)(6) Dep. 177–78, Pl.'s Ex. E, docket no. 119; Pl.'s Exs. 52, 53, 54, docket no. 122.) Finally, Cole contends that Champion owes him for a salary increase that was never effectuated. Cole notes that Cham-

---

4. In the Amended Complaint, Cole alleged that Champion failed to pay Cole the following, all of which constitute wages under N.C. GEN.STAT. 95–25.2(16): Cole's increased salary retroactive to January 2004; Cole's additional increases upon Champion experiencing two consecutive profitable quarters; Cole's bonus compensation for 2004 through and including the date of termination; Cole's vested performance shares; Cole's right to hold, as vested and not immediately exercisable, his stock option grants per the terms of the January and February 2001 stock option agreements; and severance benefits pursuant to a March 2004 agreement with Champion. (Am. Compl.¶ 62.)

pion was profitable during the second and third quarters of 2004. (Griffiths Dep. 72, Pl.'s Ex. K, docket no. 119; Knight Dep. 32–33, Pl.'s Ex. G, docket no. 119; Pl.'s Ex. 14, docket no. 122.) Moreover, at a Board meeting on September 14, 2004, while Cole was still employed by Champion, Champion's Board voted to abolish the voluntary salary reductions for executive officers. (Griffiths Dep. 217–19; Pl.'s Ex. 25, docket no. 122.) According to Cole, not only did Champion refuse to reinstate Cole's salary to the pre-reduction amount, Champion also refused to implement the salary increase agreed upon and approved by Champion's Board on April 27, 2004. Cole contends that Champion's willful refusal to pay Cole his agreed-upon compensation is the exact conduct the Wage and Hour Act is designed to prohibit. Cole further argues that Champion has produced no evidence that the Board changed Cole's compensation and provided the requisite notice to Cole after April 27, 2004. Cole contends that he is, therefore, entitled to judgment as a matter of law on this claim. In response, Champion contends that Cole has neither a claim under the N.C. Wage and Hour Act nor a claim for breach of contract.

Applying the above-stated law to the evidence on summary judgment, I find that there was never an enforceable contract between the parties with the terms as alleged by Cole. First, because Cole was a named executive officer subject to the Securities Exchange Act, his compensation was set exclusively by the Board of Directors and the Compensation Committee of the Board. Cole's incentive compensation, which included his stock options, his annual incentive (bonus) and any performance shares, was administered by the Compensation Committee, pursuant to terms of the 1995 Stock Option and Incentive Plan. (Collins Aff. ¶ 31, docket no. 114.) Thus, the Board, and not another executive officer, decided each officer's compensation.[5] Cole has not disputed that the Board is responsible for setting compensation for Champion's executive officers. Indeed, during Cole's employment, the Board, not management, made determinations regarding employment terms such as incentive grants, salary increases, and annual bonuses. (Collins Aff. ¶ 35, docket no. 114.) Therefore, with regard to any of Cole's April 2003 discussions with Walt Young in a Las Vegas hotel room, Young had no authority to reach an agreement with Cole concerning the terms of his compensation. Indeed, Cole has admitted that his purported verbal agreement with Young was "subject to board approval." Because the Board indisputably did not approve the "agreement" between Cole and Young, an express condition to the enforceability of the agreement was never fulfilled. *See BMS Natural Res., Inc. v. Krupp Lonrho Mining Corp.,* 74 F.3d 1230, 1996 WL 7988, at *2 (4th Cir.1996) (unpublished) (applying Michigan law, holding that where a contract contained a clear condition precedent—approval by defendant's board of directors—and where the condition was not met, plaintiff had no contract claim). Furthermore, Cole's claims relating to his discussions with In-

---

5. As Champion notes, in the wake of Enron and other corporate governance scandals, in July 2002 Congress enacted the Sarbanes Oxley Act, and the New York Stock Exchange began to consider, and later adopted, rules for listed companies that, among other things, required stricter oversight by the Board of executive management, a compensation committee comprised entirely of independent directors, the adoption of a charter for the compensation committee that specifically set out the committee's authority regarding executive compensation, the required adoption of corporate governance guidelines, and the disclosure of those guidelines and committee charters on the listed company's website. (*See* Defs.' Br. Supp. Mot. Summ. J. at 5–6, docket no. 121.)

terim CEO Koch in 2004 suffer from the same legal deficiencies as his claims relating to discussions with Young in 2003. Koch, as Interim CEO, had no authority to set or revise the terms of Cole's salary, incentive compensation, or benefits and Cole knew this. Indeed, Cole has admitted that Koch told him twice that the Board would have to approve the terms of any compensation package because Cole was an executive officer. Thus, any argument by Cole that he reasonably believed that either Young or Koch had apparent authority to negotiate terms of Cole's employment on Champion's behalf has no merit. *See Estate of Redding v. Welborn,* 170 N.C.App. 324, 331, 612 S.E.2d 664, 669 (2005) ("A third party [Cole] acquires no rights against a principal [Champion] when the third party has either actual or constructive knowledge of what the principal has authorized his agent [Young] to do.").

Next, as to the terms that the Board approved at the April 27, 2004, Board meeting, I agree with Champion that the Board approval did not give rise to an enforceable oral contract between Cole and Champion. First, although Board approval was certainly necessary to alter the terms of Cole's employment, the evidence in this case shows that the Board's approval alone was not sufficient to constitute an enforceable contract without further negotiations for several reasons. First, several of the terms proposed to the Board were simply too indefinite to be enforceable without further negotiations and clarification. Moreover, the alleged contract that Cole now seeks to enforce differs in concept fundamentally from what the Board actually considered and approved. As noted, at the Board meeting, Koch made a Power Point presentation, which contained the following outline of suggested changes to Cole's employment terms.

**APPROVAL REQUEST TO BOARD**

- Increase Mark Cole salary by $20,000.
- Salary will increase to $300,000 after two profitable quarters (versus 285,000 now).
- Give Mark an option to: Retain current restricted stock (40,000 shares) and target bonus of 80%, **or** Take restricted stock of 50,000 shares and reduce target bonus to 60%
- Give Mark a change of control agreement
- If Cole is removed as President of Retail without cause, then: He may continue as a CHC retailer with a different assignment requiring about 10 days per year. His salary would be reduced to approximately $20,000 to $30,000 per year. This will preserve Mark's existing restricted stock and option grants. Vesting would occur on targeted dates if he is still employed.

As for Cole's claim that Champion agreed that his options would be vested if he were fired without cause, this is not what the Board approved. The Board specifically approved the concept of maintaining Cole as an employee in a limited capacity so that his options could vest "on targeted dates if he is still employed." Cole's duties in "assisting" with Champion's "retail program" in a limited capacity as "advisor" or "facilitator" are never spelled out. Nor is the Power Point outline specific as to when or how often Cole would be required to perform this role, stating only that the duties will require "about 10 days per year." Although the Power Point slides speak of Cole choosing a higher cash bonus and a greater number of performance shares, there is no suggestion of when Cole might or must make an election. Finally, although the Board approved a $20,000 raise for Cole generally, there is no mention of whether the raise would be retroactive as Cole contends. Thus, even after the Board's April 2004 approval, there were still many issues left

open regarding the terms of Cole's continued employment with Champion. *See Volumetrics,* 243 F.Supp.2d at 402 (detailing the lack of definitive terms, including "the parties' respective duties," in a document held not to be a contract and noting the parties' notion of incompleteness of the agreement).

Similarly, Cole's argument that the Board approved a definite term for his limited employment is without merit. Cole contends that the Board approved employing him in a limited capacity until his shares vested, which would occur in 2007. Cole maintains, therefore, that the Board approved retaining him as a Champion employee for a definite term (until 2007) so that his options could vest. The proposed terms that were presented to the Board, however, specifically stated that the Board approved of employing Cole in a limited capacity and that "[v]esting would occur on targeted dates *if he is still employed.*" There is no evidence that the Board approved of retaining Cole as a limited employee for a definite term. *See also Braun v. Glade Valley Sch., Inc.,* 77 N.C.App. 83, 89–90, 334 S.E.2d 404, 408 (1985) (stating that there was no enforceable contract where the parties "never reached a mutual understanding as to salary, fringe benefits, length of employment, duties and responsibilities, or housing arrangements"). Thus, to the extent that Cole contends that the parties reached an agreement regarding a definite term of employment and that his options would vest upon being terminated

without cause, the court finds no such agreement as a matter of law. Finally, the approval of a change of control agreement is also too indefinite to be enforced.[6] Beyond approving a change of control agreement generally, the Board specified absolutely no terms of such an agreement.

In addition, Cole contends that Champion is bound to several terms that were either never presented to the Board or that are fundamentally inconsistent with what the Board did approve. For instance, Cole claims that the oral contract with Koch relieved him of his noncompetition agreements, but the Power Point slides are directly to the contrary. Furthermore, Cole contends that he was promised severance, but the Board never discussed severance for Cole. Finally, as to Cole's allegations regarding his right to a prorated bonus, the Power Point presentation does not refer to any payment of a pro-rated bonus upon termination, and Cole has not shown that the Board ever approved such a bonus. Moreover, Cole's entitlement to an annual incentive bonus is derived from the 1995 Stock Option and Incentive Plan, which is administered by the Board's Compensation Committee. The Plan, however, clearly provides that employees terminated before the end of a fiscal year are not entitled to an annual incentive for the year. (*See* Collins Aff. & Ex. O, docket no. 114.) Thus, Cole has simply failed to raise an issue of fact as to whether Champion ever promised him certain benefits that would constitute wages under the North Carolina Wage and Hour Act.[7]

---

**6.** A "change in control" generally refers to a transfer of ownership in which a new person or entity obtains a fifty percent or greater ownership interest. Senior executive contracts often contain a change in control clause, which provides for certain protections in the event of a change of control in the company.

**7.** In addition, as Champion notes, as to certain alleged wages, such as his alleged right

to a bonus, Cole's Wage and Hour Act claim is fatally deficient because he is attempting to transform alleged contractual damages into a claim for wages under the Act. The N.C. Wage and Hour Act protects employees from being denied payment of earned wages. *See Hamilton,* 118 N.C.App. at 8, 454 S.E.2d at 282. Thus, the Act only requires an employer to pay those wages and benefits due when the employee has *actually performed the work* required to earn them. *Narron v. Hardee's Food*

Moreover, the objective conduct of the parties demonstrates that all parties contemplated that, notwithstanding the Board's approval, the terms of Cole's employment would need to be finalized in a written agreement. For instance, Champion's legal department sent the first draft of an employment agreement to Cole on or around June 11, 2004. (Collins Aff. ¶ 41, docket no. 114.) Upon receiving the draft, Cole's counsel did not reject the draft as an inappropriate modification of an already binding oral agreement. Instead, counsel thanked Champion's counsel for sending him the draft. (*Id.*) The draft contained a merger clause stating that the written agreement would constitute the "sole agreement" between the parties, and Cole's counsel never objected to that provision. Indeed, at no time during the ongoing negotiations did Cole's counsel Barrett ever take the position that Cole already had an oral contract relating to Cole's benefit and employment claims that would be enforceable without being put into writing and approved by the Board. (Kreindler Aff. ¶ 16, docket no. 115.)

I further note that well after the April 2004 Board approval, the parties continued to negotiate the terms of Cole's employment by sending proposed modifications back and forth, and there is no evidence that Cole behaved as if the Board's approval to his salary increase was effective on the date that the Board gave approval to an increase. That is, after the April meeting, Cole did not go to the payroll department and ask why his salary had not been increased, nor did he inquire as to where his additional performance shares were. Nor did he complain, between April and his termination in October 2004, to anyone at Champion about the implementation of an alleged oral agreement to raise his salary. Rather, in response to the June draft sent by Champion's counsel on July 20, 2004, Cole's counsel submitted a black-lined "revision" and "modification" to Champion's draft. Many of Cole's proposed revisions were not only significant, but also they were irreconcilable with the agreement that he says the Board approved. (*See* Kreindler Aff. ¶¶ 10–13, docket no. 115.) For instance, in the black-lined agreement that Barrett prepared on Cole's behalf and forwarded to Champion's legal department on July 20, 2004, Cole proposed the following changes that were not initially acceptable to Champion: (1) Cole's ability to be an officer of another company while employed with Champion without Champion's prior approval; (2) removing Champion's discretion from the determination of profitability in Section 4(a); (3) removing the reduction in incentive compensation while retaining the increase in performance shares; (4) immediate vesting of Cole's performance shares were he to be removed as President, Retail Operations; (5) modifying the term of Cole's employment as Special Assistant; (6) retaining full benefits during his part-time employment as Special Assistant; (7) the ability to operate one sales location at any location without Champion's approval while employed as Special Assistant; and (8) the removal of the stocking requirement for Champion-built homes. (Kreindler Aff. ¶ 9 & Ex. F, docket no. 115.)

After Champion received the black-lined draft, negotiations between the parties continued, with attorney Kreindler han-

*Sys., Inc.,* 75 N.C.App. 579, 583, 331 S.E.2d 205, 208 (1985). Since at the time of his October 18, 2004, termination, Cole had not performed the work required to earn the wages and bonuses he alleges, any possible remedy could only lie in breach of contract, not the Wage and Hour Act. The same is true for his claim under the Act related to his alleged right to "performance shares" and Champion's alleged promise to allow him to continue working for Champion in a limited capacity so that his equity interests could vest.

dling the negotiations with Cole's attorney Barrett. (Collins Aff. ¶ 43, docket no. 114.) By August 31, 2004, Barrett and Kreindler had communicated by telephone and e-mail in an attempt to negotiate Cole's employment agreement. Champion rejected and was not willing to negotiate the following significant changes that Barrett had made to the proposed employment agreement: (1) Cole's ability to be an officer of another company while employed with Champion without Champion's prior approval; (2) removing the reduction in incentive compensation while retaining the increase in performance shares; (3) the immediate vesting of his performance shares were he to be removed as President, Retail Operations; (4) retaining full benefits during his part-time employment as Special Assistant; (5) the ability to operate one sales location at any location without Champion's approval while employed as Special Assistant; and (6) the removal of the stocking requirement for Champion-built homes. (Kreindler Aff. ¶ 10, docket no. 115.) Kreindler communicated to Barrett that these items were unacceptable to Champion, and Barrett and Kreindler discussed alternative proposals for each party to consider. For instance, Champion indicated to Cole that it was willing to discuss five open items, some of which arose from the alternative proposals discussed during negotiations.[8] On September 2, 2004, Kreindler sent an

e-mail to Barrett, responding to questions Barrett had asked Kreindler about two of the five open issues that Champion was willing to discuss, including the cost of COBRA benefits and whether Cole's employment as a Special Assistant would constitute employment under the terms of Champion's deferred compensation plans. Kreindler informed Barrett in the e-mail that he was waiting from Collins on two of the other issues Champion was willing to discuss. (Kreindler Aff. ¶ 12, docket no. 115.) Ultimately, the parties never reached a written agreement before Cole was terminated in October 2004.

The black-lined revision of the June draft constituted a counteroffer that operated as a rejection of an offer extended by Champion. Under both North Carolina and Michigan law, when a party makes a counteroffer, the original offer has been rejected and ceases to exist. *See Normile v. Miller*, 313 N.C. 98, 106, 326 S.E.2d 11, 17 (N.C.1985); *Kashat v. Prangs*, 16 Mich. App. 76, 167 N.W.2d 603, 604 (1969). Moreover, the September 2004 letter of intent from Cole to Champion contained proposals concerning Cole's compensation that were fundamentally inconsistent with the concept approved by the Board at its April 27 meeting. (Collins Aff. ¶ 45, docket no. 114.) For instance, Cole presented the following terms concerning his compensation in the September 30, 2004, letter of intent: (1) a stock grant of 50,000

---

**8.** These items included the following: (1) as an alternative to the immediate vesting of Cole's performance shares if he were removed as President, Retail Operations, Barrett asked if Champion would consider alternative corporate-based benchmarks to replace the retail benchmarks in Cole's performance shares award; (2) modifying the term of Cole's employment as Special Assistant through early 2007 so that more potential performance shares and other equity compensation could vest; (3) as an alternative to full benefits during his part-time employment as Special Assistant, whether Champion was

willing to allow Cole to pay for those benefits under COBRA; (4) as an alternative to no stocking requirement, whether Champion would consider lowering the percentage from 80% to 50%; and (5) as an alternative to the immediate vesting of Cole's performance shares if he were removed as President, Retail Operations, whether Champion would confirm that Cole's employment as Special Assistant would constitute employment under the terms of Champion's compensation plans and would not trigger a distribution. (Kreindler Aff. ¶ 10, docket no. 115.)

shares (in lieu of performance shares vesting over time); (2) immediate exercisability of all stock options; (3) the ability to exercise stock options at any time until the stated expiration date; (4) immediate vesting of deferred compensation; and (5) immediate release from all noncompetition terms. (Kreindler Aff. ¶ 14 & Ex. H, docket no. 115.) Each of these requests was inconsistent with the concept outlined in the Power Point and the "agreement" that Cole contends that the parties had entered into. Furthermore, the proposal included additional terms that were not discussed in the Board materials or presentation from April 2004, including payment of certain retroactive salary amounts, payment of a $300,000 severance benefit, and payment of a pro-rated annual incentive based on a 9-month calculation period. (Collins Aff. ¶ 45, docket no. 114.) The letter of intent also specifically stated that "the parties recognize again that t his letter is intended to set forth a proposal ... and ... does not create any binding obligations." After Cole sent the letter of intent, the parties continued to negotiate on the proposed asset purchase and the various employment issues, with at least one more draft going back and forth, until Champion ultimately decided to terminate Cole's employment in October. (Kreindler Aff. ¶ 15–17, docket no. 115.) Given the ongoing negotiations during the Summer of 2004, Cole's own objective conduct in this case demonstrates that he did not consider the terms that were presented to the Board to constitute a binding oral agreement.

In sum, I find that application of the following factors compels a conclusion that the parties intended a written agreement to govern any agreement regarding Cole's employment terms: (1) by virtue of the SEC rules alone, contracts with named executive officers are virtually always in writing; (2) the Power Point presentation was incomplete and the agreements and associated incentive compensation plans were complicated and detailed; (3) the amounts of Cole's incentive compensation, particularly if Champion's stock price rose, were significant; (4) the contract was novel and complicated; and (5) the parties indisputably—and without registering objection—negotiated, albeit unsuccessfully, the written agreements reflecting Cole's new arrangement. Moreover, all of Cole's prior employment agreements with Champion were reduced to writing and signed by Cole; the employment arrangement contemplated by the parties was unusual and "complicated"; Cole has admitted that from the time that discussions began with Champion about compensation, Cole contemplated that the agreements would be put into writing; Cole's own notes reveal that in July 2003, Collins—Champion's general counsel at the time—explained that any agreement about the terms and conditions of Cole's compensation needed to be in writing; Koch informed Cole that Champion's legal department would be preparing a writing for Cole's review; and during negotiations Cole's attorneys sent back substantial and substantive blacklined comments, but they never suggested that some "oral agreement" was already in place. These undisputed facts all demonstrate the existence of ongoing negotiations, rather than a "mere memorial" of an already agreed-upon contract. *See, e.g., Key Motorsports, Inc.,* 40 F.Supp.2d at 347–48 ("The exchange of letters between the parties here indicates that issues remained open for negotiation after the [alleged oral contract] meeting."). For all these reasons, I find that there was no enforceable contract according to the terms alleged by Cole.[9] In sum, viewed

---

**9.** Champion contends additionally that, to the extent there was an oral contract, Michigan's statute of frauds bars Cole's contract claims because Cole has alleged that he was prom-

objectively, neither of the parties' actions evidence an intent to bind Champion to an employment agreement involving millions of dollars in wages, bonuses, and stock options based on a bullet-point sketch in the form of Power Point slides. Thus, it will be recommended that the court grant summary judgment to Champion as to Cole's breach of contract and N.C. Wage and Hour Act claims.

**B. Whether Cole is Entitled to Severance Benefits under an Alleged March 2004 Oral Severance Agreement Between the Parties Pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B)**

In its prior motion to dismiss, Champion sought the dismissal of Cole's North Carolina Wage and Hour Act and breach of contract claims based on grounds of ERISA preemption. The court, in adopting the Recommendation of the undersigned on Champion's motion to dismiss, ruled that Cole had sufficiently alleged that the parties had entered into an oral agreement in 2004 for Champion to provide Cole with a severance plan. The court also ruled that the alleged March 2004 oral severance plan constitutes an employee welfare benefit plan under ERISA. The court further held that the N.C. Wage and Hour Act claim regarding the alleged severance plan was preempted by ERISA, but that it should be treated as a federal claim under ERISA, 29 U.S.C. § 1132(a)(1)(B). On summary judgment, Champion and SSH now argue that the undisputed facts show that Cole and Champion never entered into an enforceable agreement for a severance plan. Cole argues, on the other hand, that Koch and Cole entered into an oral agreement on

March 25, 2004, in which Koch, acting on behalf of Champion, agreed that Cole would receive the same severance benefits that Champion was developing for all of Champion's Rule 16(b) officers. Cole further contends that the severance plan met all the requirements for it to constitute an "informal" severance plan under ERISA. According to Cole, Koch assured him that the severance plan would be in place by July 2004. Cole further contends that Koch also told him that the severance benefits would be comprised of salary continuations for at least one year and probably for longer than a year.

It is undisputed that Champion's compensation officer Graskamp had been working on putting together severance agreements for Champion's Rule 16(b) officers but, due to Champion's delay, those agreements were not in place in July 2004. The Executive Officer Severance Pay Plan was not ready to go until September 13, 2004, and Graskamp presented the plan to Champion's Compensation Committee and Board in a meeting held on September 14, 2004. (Pl.'s Ex. 235, docket no. 123, filed under seal.) During the September 14 meeting, Graskamp learned that Cole was to be fired and scratched Cole's name off of the list of proposed participants of the severance plan. (Graskamp Dep. 290–92, Pl.'s Ex. H, docket no. 119.) Furthermore, at the same meeting, Griffiths obtained Board approval to terminate Cole's employment. Champion did not adopt the severance plan at the September 14, 2004, meeting. Instead, the plan was not adopted until November 22, 2004, after Cole was fired, with an effective date of December 1, 2004. Cole contends, never-

ised to be employed for a term of 3 years. Under Michigan law, contracts that, by their terms, cannot be completed within a year from their making are subject to Michigan's statute of frauds. MICH. COMP. LAWS § 566.132(1)(a) (applying specifically to "[a]n

agreement that, by its terms, is not to be performed within 1 year from the making of the agreement"). Since there was no oral contract to begin with, there is no need to address the statute of frauds argument.

theless, that he should have received all of the benefits in the Executive Officer Severance Pay Plan which he was unlawfully deprived of by Champion's termination of his employment without cause on October 18, 2004. Cole contends that the Executive Officer Severance Pay Plan was clearly developed and the terms known at the time of Cole's termination. Cole contends, moreover, that these benefits had been promised to Cole on March 25, 2004, and based on this promise Cole agreed to remain employed by Champion.

The undisputed facts show that Cole is not entitled to any severance benefits. First, Cole's alleged promises about severance benefits came from individuals who had no authority to establish the severance plans. That is, regardless of Koch's alleged promises to Cole in March 2004 about the severance plan, it is undisputed that neither the Board nor the Compensation Committee approved any severance promise made by Koch. Furthermore, although the Board did adopt a severance plan in December 2004, Cole undisputably was not a participant in that plan, as his employment had already been terminated when the plan became operative.[10] Moreover, the "severance promises" that Cole seeks to enforce are far too vague and indefinite to give rise to a colorable claim for ERISA benefits. *See generally Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (stating that for a former employee to have standing as a "participant," he must expect to return to covered employment or have a colorable claim to vested benefits); *McNabb v. Mich. Consol. Gas Co.,* 656 F.Supp. 866, 868 (E.D.Mich. 1987) (stating that "without a definite promise from" an employer, the employer was not bound to pay benefits; there is no obligation when the plan "contain[s] no 'statement which could conceivably be read as creating an obligation on the part of [the employer] to provide ... benefits' "). That is, by Cole's own testimony, the terms of the severance plan were not known when Koch made his "severance promise." (*See* Cole Dep. 305 ("We had not reached agreement on the exact terms of that severance issue." [11])) Cole cannot create an enforceable right to severance benefits simply by relying on Koch's "predictions" as to the amount of severance benefits that would be payable under the plan then being developed by the Board's compensation consultant. Furthermore, Young's alleged brief reference in 2003 to Cole "having" a year's severance—without discussing the way in which the benefits would be paid, the conditions for their receipt, any definition of "cause," and any obligation of mitigation—cannot constitute the kind of definite promise to give rise to a claim for benefits under ERISA. *See Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1082 (1st Cir.1990).

Finally, it is undisputed that Champion offered Cole one year's salary as a severance payment after he was terminated. Although the severance package that was ultimately offered to Cole, but which Cole

---

**10.** Cole argues, alternatively, that Koch promised a severance plan that was independent of the Executive Officer Severance Pay Plan developed by Graskamp. Cole testified in his deposition, however, that Koch told him that he was going to be part of the plan being developed by Graskamp. (Cole Dep. 73.) Cole was clear that he was not being promised some "separate" severance agreement from other senior management. (Cole Dep. 72–73.) Thus, the only "severance benefit plan" that Koch discussed was the plan the Board adopted in December, after Cole's termination.

**11.** Indeed, as Champion notes, Cole himself stopped short of claiming that he and Koch had "a deal" regarding severance. Cole testified only that Koch told him he would be included in the plan under development. (Cole Dep. 72.)

rejected, carried with it an obligation to sign a release, the same release is required by the severance benefit plan that Champion adopted for its Rule 16(b) officers in December 2004. For all these reasons, it will be recommended that the court find that the parties had not entered into an enforceable agreement for Cole to participate in a severance plan.

### C. Whether Champion's Alleged Enforcement of the Noncompete Agreements Constituted an Illegal Restraint on Trade under N.C. Gen. Stat. § 75–1

Next, Cole is seeking a declaratory judgment from the court that the covenants not to compete that Cole entered into in the 2001 stock option agreements are invalid and unenforceable because their terms are unreasonable restraints on trade. When Cole filed his amended complaint in July 2005 seeking a declaratory judgment regarding the enforceability of the covenants, the covenants were still operative. By their own terms, however, both of those covenants expired in October 2006, which was two years after Cole's employment was terminated in October 2004. Thus, the court agrees with Champion that Cole's request for a declaratory judgment regarding the reasonableness of the covenants is moot. *See* 10B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2757 (3d ed. 1998) ("[A] declaratory judgment cannot be given, if a matter has become moot.").

Cole, nevertheless, has asked the court to find that the covenants were unreasonable in order to further his argument that he is entitled to damages based on Champion's alleged violations of North Carolina's Chapter 75, which, *inter alia,* prohibits illegal restraints of trade and which provides for treble damages.[12] More specifically, North Carolina's restraint of

trade statute provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal...." N.C. Gen.Stat. § 75–1. In response, Champion has argued that the terms of the covenants were reasonable and, in any event, Champion is entitled to summary judgment on Cole's Chapter 75 restraint of trade claim. For the following reasons, I agree with Champion.

▆▆▆ "A covenant not to compete is 'basically an agreement in restraint of trade.'" *Market Am., Inc. v. Rossi,* No. 1:97CV00891, 1999 WL 1939247, at *20 (M.D.N.C. Apr. 15, 1999) (quoting *Wilmar, Inc. v. Liles,* 13 N.C.App. 71, 74, 185 S.E.2d 278, 280 (1971)). "'However, [North Carolina] courts have recognized the rule that a covenant not to compete is enforceable in equity' in some circumstances." *Id.* (quoting *Starkings Court Reporting Servs., Inc. v. Collins,* 67 N.C.App. 540, 541, 313 S.E.2d 614, 615 (1984)). A covenant not to compete is generally enforceable and not in restraint of trade only if it is (1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) designed to protect a legitimate business interest of the employer. *Okuma Am. Corp. v. Bowers,* 638 S.E.2d 617, 620 (N.C.Ct.App.2007). When considering the enforceability of a covenant not to compete, a court examines the reasonableness of its time and geographic restrictions, balancing the substantial right of the employee to work with that of the employer to protect its legitimate business interests. *Id.* at 618. The covenants at issue state that Cole, for two years after his termination of employment, could not

---

**12.** *See* N.C. Gen.Stat § 75–16 (providing for treble damages).

directly or indirectly ... as owner, partner, joint venturer, employee, broker, agent, principal, trustee, corporate officer, licensor, consultant, or in any capacity whatsoever, engage in, become financially interested in, or have any connection with, any business located in the United States or Canada engaged in the production, sales, financing, insuring, or marketing of manufactured homes or the development of manufactured housing parks.

(Am.Compl.¶¶ 18, 22, Exs.3, 4.) In arguing that the covenants are not enforceable, Cole contends that the covenants do not protect a legitimate business interest and, furthermore, that they are overbroad. Cole notes that Champion completely divested from its traditional retail housing operations in mid–2005 and that Champion divested from its financing company in 2003 and from its manufactured housing development division in 2005. Cole also notes that while working for the company, Cole was President of Champion Retail, and he did not have responsibility for Champion's manufacturing or other divisions. Cole asserts that the covenants are too broad to protect a legitimate business purpose, particularly considering Champion's divestiture of its retail division. *See, e.g., VisionAIR, Inc. v. James,* 167 N.C.App. 504, 606 S.E.2d 359 (2004) (holding that broad restrictions to areas beyond similar work performed were invalid); *Hartman v. W.H. Odell & Assocs., Inc.,* 117 N.C.App. 307, 317, 450 S.E.2d 912, 920 (1994) (holding that a covenant stating that an employee "may not 'own, manage, lease control, operate, participate, consult or assist' any 'entity' that provides 'actuarial services'" was overbroad and therefore not enforceable).

In response, Champion contends that the terms of the noncompetition agreements were entirely reasonably and the noncompetes were therefore enforceable against Cole. Champion notes that it did not immediately sell all of its traditional retail lots upon Cole's termination in October 2004 and that Champion retained significant traditional retail operations of its own through July 2005. (Collins Aff. ¶¶ 14–15, docket no. 114.) Champion further argues that even though it sold the traditional retail operations that it had owned, that Champion still retains a retail business in California with revenues exceeding $100 million a year and that Cole, as President of Retail, had direct responsibility for that business. Champion further contends that as a wholesaler it cannot be successful if its retail buyers dry up and that the vast majority of Champion's revenues, even when Company-owned retail was at its zenith, have been through independent dealers. (*Id.* ¶ 18.) Champion contends that, for these reasons, Champion retained a valid interest in keeping an individual who ran its nationwide retail operations out of the traditional retail market for a reasonable period of time. According to Champion, Cole's entrance into the retail market on behalf of a competitor could easily threaten Champion's core business of selling product to retailers. Champion contends that not only does Cole have substantial resources, but he also has extensive, intimate, and confidential knowledge about virtually all aspects of Champion's business, derived from his receipt of detailed financial information, receipt of regular reports from the Company's CEO and CFO, and his participating in senior management meetings. (Collins Aff. ¶¶ 12, 18, 25–29, docket no. 114.) Champion contends that, for this reason alone, the noncompete agreements are enforceable against Cole.

Champion has sufficiently shown that the covenants not to compete were reasonably drafted to protect Champion's legitimate interests and they were, therefore, enforceable before they expired on their

own terms.[13] In any event, Champion is not trying to enforce the covenants not to compete since they have expired on their terms. Rather, the parties have asked for a ruling on the issue of reasonableness on the assumption that it affects Cole's Chapter 75 restraint of trade claim. Even if I were to find, however, that the covenants at issue were unreasonable as to time, territory, etc., for the following reasons I would still find that Cole cannot recover damages for a Chapter 75 claim based on illegal restraint of trade.

N.C. GEN.STAT. § 75–1 "was based upon section one of the Sherman Act." *Rose v. Vulcan Materials Co.,* 282 N.C. 643, 655, 194 S.E.2d 521, 530 (1973). Accordingly, "the body of law applying the Sherman Act, although not binding upon [a court] in applying G.S. § 75–1, is nonetheless instructive." *Id.; see also Sewell Plastics, Inc. v. Coca–Cola Co.,* 720 F.Supp. 1196, 1220 (W.D.N.C.1989) (applying an identical analysis in dismissing both the Sherman Act and N.C. GEN.STAT. § 75–1 claims), *aff'd,* 912 F.2d 463 (4th Cir.1990). Consistent with federal antitrust law and in order to recover damages for an unenforceable noncompete under North Carolina antitrust law, Cole must prove both adverse impact and "antitrust injury." The requirement of "antitrust injury" reflects the oft-stated principle that the antitrust laws "were enacted for the 'protection of competition, not competitors.'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). To prove "antitrust

injury," an antitrust plaintiff must prove "more than mere individual injury." *Patel v. Scotland Mem'l Hosp.,* No. 3:94CV284, 1995 WL 319213, at *5 (M.D.N.C. Mar. 31, 1995), *aff'd,* 91 F.3d 132, 1996 WL 383920 (4th Cir.1996); *see also Rose,* 282 N.C. at 656, 194 S.E.2d at 530–31 (observing that actionable antitrust violations require "broad ... interfere[nce] with the interest of the public"); NORTH CAROLINA LAW OF DAMAGES § 29–5 (5th ed. 2006) ("[N.C. GEN.STAT. § 75–1] was based upon section one of the Sherman Act and requires a prejudice to the public interest on a broad basis, not just action affording a fair protection to the parties, to be actionable.").

Furthermore, because the noncompetition provision that Cole challenges is contained in a stock option agreement, his antitrust claim is necessarily analyzed under a "rule of reason." The United States Supreme Court has stated that the rule of reason is the "standard for testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction, such as an employment contract." *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 689, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *see also Lektro–Vend Corp. v. Vendo Co.,* 660 F.2d 255, 269 (7th Cir.1981) (applying rule of reason to antitrust claim based on employee noncompete agreements). Under the rule of reason, a party must show an adverse effect on competition as a whole within the relevant market. *See R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,* 199 F.Supp.2d 362, 380 (M.D.N.C.2002); *Stearns v. Genrad, Inc.,* 564 F.Supp. 1309,

---

**13.** Moreover, the covenants not to compete specifically state that

> [i]f any one o[r] more of the terms contained [in the noncompetition agreement] shall for any reason be held to be excessively broad with regard to time, duration, geographic scope, or activity, that term shall be construed in a matter to enable it to be

enforced to the maximum extent compatible with applicable law.

Thus, the terms of the noncompetition agreements specifically authorize the court to remove any unreasonable terms in the agreements so that the agreements could, nevertheless, be enforced with the reasonable terms intact.

1315 & 1318 (M.D.N.C.1983). Therefore, a non-competition covenant may be unreasonable between the parties, yet still not violate a state's antitrust laws if the plaintiff cannot show an adverse effect on competition as a whole within the relevant market. As another state's supreme court has succinctly explained in discussing the rule of reason:

> Until recently, there were few attempts to apply antitrust law to post-employment noncompetition agreements. There can be little doubt that the Sherman Act applies to such agreements. However, it appears that no such non-competition agreement has ever been held to violate the Sherman Act. One explanation for this absence of precedent may be the difficulty involved in proving that a post-employment noncompetition agreement violates the Sherman Act. Such agreements are not per se violations of the Sherman Act but must be analyzed under the rule of reason. To establish a violation under the rule of reason, one must prove that the agreement has an adverse effect on competition in the relevant market. This is distinguished from the effect a post-employment noncompetition agreement has on the particular employer and employee involved. Rule of reason analysis under antitrust laws must not be confused with reasonableness analysis under the common law. Rule of reason analysis tests the effect of a restraint of trade on *competition*. By contrast, whether a noncompetition agreement is reasonable depends upon its effect on the parties, the *competitors*, as it were. The two standards are not directly related. An agreement may be reasonable as between the parties and nevertheless violate antitrust laws. Conversely, an agreement may be unreasonable as between the parties and yet not violate the rule of reason test under the antitrust laws.

*DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687–88 (Tex.1990) (citations omitted) (emphasis in original); *see also* 54A Am. Jur.2d *Monopolies* § 841 (2007) (stating that "[e]ven an unreasonable covenant not to compete does not necessarily violate the [states'] antitrust laws; to constitute such a violation, there must be an adverse effect on the relevant market").

Moreover, as the Fourth Circuit has emphasized, "[t]he antitrust laws were not intended ... as a vehicle for converting business tort claims into antitrust causes of action." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 711 (4th Cir.1991). In *Oksanen,* the Fourth Circuit specifically "affirm[ed] the district court's ... refusal to cloak in federal antitrust law what is in essence a workplace dispute." *Id.* at 699. The court reasoned that the plaintiff could not make out a federal antitrust claim "merely by showing that it caused him an economic injury" and stated that "[i]f the law were otherwise, many a ... workplace grievance ... would be elevated to the status of an antitrust action." *Id.* at 708. The court went on to hold that "[b]ecause [plaintiff] has failed to establish his restraint of trade and monopoly claims under federal law, his state law antitrust claims likewise fail." *Id.* at 710. *Accord Patel,* 1995 WL 319213, at *5 (where a hospital's actions allegedly "destroyed" the plaintiff's medical practice, dismissing the plaintiff's federal and state antitrust claims because the plaintiff "failed to allege a cognizable antitrust injury" instead of a "mere individual injury," where there was no evidence of an effect of the hospital's actions on competition in the relevant market).

Cole cannot show an adverse effect on competition by merely showing that he was unreasonably restrained from competing with Champion.[14] The court agrees

---

14. Indeed, as Champion has pointed out, allowing Cole to prove a restraint of trade claim

with Champion that keeping one individual out of the highly competitive and disperse mobile home market does not rise to the level necessary to show an antitrust violation. Rather, Cole must prove an adverse effect on competition as a whole in the relevant market, which he has failed to do; thus, Cole has not established the required antitrust injury.[15] *Accord Stearns,* 564 F.Supp. 1309, 1315 (granting summary judgment to the defendant on the plaintiff's Sherman Act and section 75–1 claims where the plaintiff "made no attempt to show any adverse effect upon competition in any relevant market.... [Plaintiff] made no study or other analysis of the other competitors in the market, or to what extent, if any, overall competition has been impaired as a result of the alleged restrictions."). Finally, I note that Cole's sole claims of damages based on "exclusion" from the market are personal investment losses he supposedly suffered. Cole has not shown, however, that he took any steps to do that which he now claims Champion unlawfully restrained him from doing during the two-year period after termination of his employment. An essential aspect of an antitrust claim is that the plaintiff must show "an intention and capacity to compete" against the defendant. *United Roasters, Inc. v. Colgate–Palmolive Co.,* 485 F.Supp. 1041, 1049 (E.D.N.C. 1979). To be sure, Cole maintains that he turned down several potentially lucrative investment opportunities during the two-year period before the noncompetes expired, but a prospective plaintiff cannot simply imagine a venture he *might* have

undertaken in order to recover on an antitrust claim. *See generally Hayes v. Solomon,* 597 F.2d 958, 974, 976–77 (5th Cir. 1979) (holding that when facts showed "how far the proposed shopping center was from realization," plaintiffs could not recover antitrust damages for support "frustration of so ethereal a project"). For all these reasons, it will be recommended that the court grant summary judgment to Champion and SSH as to Cole's Chapter 75 restraint of trade claim.

## CONCLUSION

For the reasons stated above, it is **RECOMMENDED** that the court **GRANT** summary judgment to Champion and SSH (docket no. 113) as to all of Cole's claims. It necessarily follows that Cole's own motion for summary judgment (docket no. 116) should be **DENIED**.

---

based on single injury alone would not only trivialize the antitrust laws, elevating mere workplace grievances to the status of an antitrust action, but it would also turn the ever-changing field of noncompete law into a high-stakes gamble for employers, who could potentially face criminal sanctions under federal anti-trust laws for attempting to enforce a noncompete agreement that a court subsequently declares to be overbroad.

**15.** Champion argues, alternatively, that North Carolina's restraint of trade statute does not even apply because Michigan, not North Carolina, bears the "most significant relationship" to the covenants not to compete. The court need not delve into the choice of law issue because, even assuming that the Michigan statute applies, Champion is entitled to summary judgment on the restraint of trade claim.