Se. Anesthesiology Consultants, PLLC v. Rose, 2019 NCBC 62.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 9002
MASTER FILE
(related case 18 CVS 2955)

SOUTHEAST ANESTHESIOLOGY
CONSULTANTS, PLLC and
MEDNAX SERVICES, INC.,

Plaintiffs,

v.

GEORGE S. ROSE, M.D.; W.
EDMOND FITZGERALD, M.D.;
ADAM HODIERNE, M.D.; DAVID C.
JOSLIN, M.D.; J. TERRILL
MASSAGEE, M.D.; KEVIN D.
OSSEY, M.D.; DANIEL SINGER,
M.D.; ROSE ANESTHESIA, PLLC;
ANESTHESIOLOGY
CONSULTANTS OF NORTH
CAROLINA, PLLC; and THE MOSES
H. CONE MEMORIAL HOSPITAL
OPERATING CORPORATION d/b/a
CONE HEALTH,

Defendants.

**ORDER AND OPINION ON
SAC-ALIGNED PARTIES'
MOTION TO DISMISS**

PETER CARIGNAN, M.D.;
CHARLENE EDWARDS, M.D.;
ROBERT FITZGERALD, M.D.;
WILLIAM E. FITZGERALD, JR.,
M.D.; MICHAEL A. FOSTER, M.D.;
JOHN R. GERMEROTH, M.D.; JOHN
F. HATCHETT, JR., M.D.; ADAM
HODIERNE, M.D.; KEVIN D.
HOLLIS, M.D.; CARSWELL
JACKSON, M.D.; KYLE E.
JACKSON, M.D.; DAVID C. JOSLIN,
M.D.; JAMES T. MASSAGEE, M.D.;
CHRISTOPHER P. MOSER, M.D.;

KEVIN D. OSSEY, M.D.; GEORGE ROSE, M.D.; JAMES D. SINGER, M.D.; STEPHEN E. TURK, M.D.; and ANESTHESIOLOGY CONSULTANTS OF NORTH CAROLINA, PLLC,

Plaintiffs,

v.

SOUTHEAST ANESTHESIOLOGY CONSULTANTS, PLLC; AMERICAN ANESTHESIOLOGY, INC.; MEDNAX, INC.; MEDNAX SERVICES, INC.; and ERIC W. MASON, M.D.,

Defendants.

1.      **THIS MATTER** is before the Court on Plaintiffs Southeast Anesthesiology Consultants, PLLC ("SAC"), American Anesthesiology, Inc. ("AAI"), MEDNAX Services, Inc. ("MEDNAX Services"), MEDNAX, Inc., MEDNAX (referred to together with MEDNAX Services and MEDNAX, Inc., as "MEDNAX"), and Eric W. Mason, M.D.'s ("Dr. Mason") (collectively "Plaintiffs") Motion to Dismiss the Amended Counterclaims (the "Motion") of Counterclaiming Defendants Dr. Rose, Dr. Fitzgerald, Dr. Hodierne, Dr. Joslin, Dr. Massagee, Dr. Ossey, Dr. Singer, Anesthesiology Consultants of North Carolina, PLLC ("ACNC"), and Rose Anesthesia, PLLC ("Rose Anesthesia"), in Case No. 17 CVS 9002 and the Complaint in Case No. 18 CVS 2955 filed by plaintiffs Dr. Carignan, Dr. Edwards, Dr. Fitzgerald, Dr. Fitzgerald, Jr., Dr. Foster, Dr. Germeroth, Dr. Hatchett, Dr. Hodierne, Dr. Hollis, Dr. Carswell Jackson, Dr. Kyle E. Jackson, Dr. Joslin, Dr. Massagee, Dr. Moser, Dr.

Ossey, Dr. Rose, Dr. Singer, Dr. Turk, and ACNC against Plaintiffs as defined by this Order pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"). (ECF No. 51.) Counterclaiming Defendants in Case No. 17 CVS 9002 and the plaintiffs in Case No. 18 CVS 2955 are collectively referred to herein as "Defendants".

2. For the reasons set forth herein, the Court **GRANTS in part** and **DENIES in part** the Motion.

*Nelson Mullins Riley & Scarborough, LLP, by Noah H. Huffstetler, III, Mark A. Stafford, Candace S. Friel, Linda L. Helms, and Stuart H. Russell for Plaintiffs and Counterclaim Defendants Southeast Anesthesiology Consultants, PLLC, MEDNAX Services, Inc., MEDNAX, Inc, American Anesthesiology, Inc., and Eric D. Mason, M.D.*

*Rossabi Reardon Klein Spivey, PLLC, by Amiel J. Rossabi and Elizabeth M. Klein, for Defendants and Counterclaim Plaintiffs Peter Carignan, M.D., Charlene Edwards, M.D., Robert Fitzgerald, M.D., William E. Fitzgerald, Jr., M.D., Michael A. Foster, M.D., John R. Germeroth, M.D., John F. Hatchett, Jr., M.D., Adam Hodierne, M.D., Kevin D. Hollis, M.D., Carswell Jackson, M.D., Kyle E. Jackson, M.D., David C. Joslin, M.D., James T. Massagee, M.D., Christopher P. Moser, M.D., Kevin D. Ossey, M.D., George S. Rose, M.D., James D. Singer, M.D., Stephen E. Turk, M.D., Rose Anesthesia, PLLC, and Anesthesiology Consultants of North Carolina, LLC.*

*Fox Rothschild, LLP, by Maureen Demarest Murray, Patrick M. Kane, and Ellis William Martin, for Defendant The Moses H. Cone Memorial Hospital Operating Corporation d/b/a Cone Health.*

Robinson, Judge.

## I. FACTUAL BACKGROUND

3. The Court does not make findings of fact on a motion to dismiss pursuant to Rule 12(b)(6), but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motion.

## A.  The Parties

4.  Anesthesiologists Peter Carignan, M.D., Charlene Edwards, M.D., William E. Fitzgerald, Jr., M.D. ("Dr. Fitzgerald"), Michael A. Foster, M.D., John R. Germeroth, M.D., John F. Hatchett, Jr., M.D., Adam Hodierne, M.D. ("Dr. Hodierne"), Kevin D. Hollis, M.D., Carswell Jackson, M.D., Kyle E. Jackson, M.D., David C. Joslin, M.D. ("Dr. Joslin"), James T. Massagee, M.D. ("Dr. Massagee"), Kevin D. Ossey, M.D. ("Dr. Ossey"), George Rose, M.D. ("Dr. Rose"), James D. Singer, M.D. ("Dr. Singer"), and Stephen E. Turk, M.D., are citizens and residents of Guilford County, North Carolina.  (Complaint ¶¶ 1, 2, 4–13, 15–18, 18 CVS 2955, ECF No. 5 ["Compl."]; Am. Counterclaim ¶¶ 1–7, 17 CVS 9002, ECF No. 18 ["AC"].) Anesthesiologist Robert Fitzgerald, M.D., is a citizen and resident of Forsyth County, North Carolina.  (Compl. ¶ 3.)  Anesthesiologist Christopher P. Moser, M.D., is a citizen and resident of Wake County, North Carolina.  (Compl. ¶ 14.)  The anesthesiologists are collectively referred to herein as the "Individual Defendants."

5.  ACNC is a professional limited liability company organized and existing under the laws of North Carolina.  (Compl. ¶ 19; AC ¶ 8.)  The Individual Defendants, Rose Anesthesia, and ACNC are referred to collectively herein as "Defendants."[1]

6.  SAC is a professional limited liability company organized and existing under the laws of the State of North Carolina.  (Compl. ¶ 20; AC ¶ 9.)

---

[1] Reference to Defendants herein does not include Defendant The Moses H. Cone Memorial Hospital Operating corporation d/b/a Cone Health ("Cone Health"), party to Case No. 17 CVS 9002, which filed its own Partial Motion to Dismiss on February 12, 2018 (ECF No. 19), which the Court determined by its Order and Opinion on August 20, 2019 (ECF No. 128).

7. AAI is a corporation organized and existing under the laws of the State of North Carolina. (Compl. ¶ 21.)

8. MEDNAX, Inc. and MEDNAX Services are corporations organized and existing under the laws of Florida. (Compl. ¶ 22; AC ¶ 10.) MEDNAX is a corporation organized and existing under the laws of North Carolina. (Compl. ¶ 23.)

9. Dr. Mason is a licensed physician and at all times relevant herein acted as the sole member and owner of SAC and AAI and the "Regional President – South Region" for MEDNAX. (Compl. ¶¶ 30–31; AC ¶ 16–17.) Defendants also contend that SAC is a wholly owned subsidiary of AAI and AAI is a wholly owned subsidiary of MEDNAX. (Compl. ¶ 25; AC ¶ 11.)

10. Defendants allege that MEDNAX used SAC, AAI, and other entities as its "alter ego" and MEDNAX used these entities to operate anesthesiology practices. (Compl. ¶ 28–29; AC ¶ 14–15.)

### B. The Agreements

11. Prior to November 2010, the Individual Defendants practiced anesthesiology through Greensboro Anesthesia Physicians, P.C. ("GAP"). (Compl. ¶ 32; AC ¶ 18.) Also prior to November 2010, GAP, pursuant to an Anesthesia Services Agreement (the "Exclusive Agreement"), was the exclusive provider of anesthesia-related care for Cone Health, which operates all of the hospitals in Greensboro, North Carolina. (Compl. ¶¶ 33, 78; AC ¶¶ 19, 64.)

12. Sometime in late 2009 or early 2010, GAP's partners and MEDNAX negotiated the potential purchase of GAP pursuant to an agreement under which

GAP's physicians would work as employees for SAC in exchange for a salary and MEDNAX would provide administrative support needed to run an anesthesiology practice, including billing, coding, collections, recruiting resources, negotiation of contracts, handling of benefits, collaboration with physicians, and support during shortages of available anesthesiologists. (Compl. ¶¶ 42, 44; AC ¶¶ 28, 30.)

13. Defendants allege that on or about November 1, 2010, MEDNAX caused SAC to execute a Stock and Personal Goodwill Purchase Agreement (the "Purchase Agreement") with GAP. (Compl. ¶ 53; AC ¶ 39.) Pursuant to the Purchase Agreement, SAC assumed all of GAP's rights and obligations, including the Exclusive Agreement with Cone Health. (Compl. ¶ 53; AC ¶ 39.) After the Purchase Agreement was signed, the Individual Defendants, who were previously GAP physicians, signed employment agreements (the "Employment Agreements") with SAC for a term of seven (7) years, each set to expire on October 31, 2017. (Compl. ¶ 54, 66; AC ¶ 40, 52.)

14. Soon after the execution of the Purchase Agreement, MEDNAX raised the rates MEDNAX charged hospitals for anesthesia-related services by thirty percent (30%). (Compl. ¶ 61; AC ¶ 47.) The Individual Defendants aver that the budgets and salaries offered by MEDNAX to induce the Individual Defendants to sell GAP and agree to the Employment Agreements were no longer accurate or relevant after MEDNAX raised its rates and that the increased rates led to "improper percentages of the anesthesiologists' fees being distributed to MEDNAX." (Compl. ¶ 62; AC ¶ 48.)

15.     Each Employment Agreement includes a non-compete agreement (the "Non-Compete Agreements") providing that "following the termination of the 'Employment Agreements' for any reason, the anesthesiologist will not engage in the practice of Anesthesiology for a period of two (2) years anywhere within thirty (30) miles of any of the health care facilities at which the Anesthesiologist had rendered medical services." (Compl. ¶¶ 68, 70; AC ¶¶ 56, 54.) The Employment Agreements also require each anesthesiologist to resign his or her medical staff memberships and clinical privileges within twenty-four (24) hours at the hospitals described in the individual anesthesiologist's Non-Compete Agreement following termination of that physician's Employment Agreement. (Compl. ¶ 71; AC ¶ 57.)

**C.     Discovery of Plaintiffs' Alleged Scheme**

16.     Counsel for the Individual Defendants sent a letter to MEDNAX on June 27, 2017 contending that the Exclusive Agreement violated North Carolina law and public policy by permitting MEDNAX to practice medicine without a license and share revenues on a percentage basis with the Individual Defendants and demanding that MEDNAX cure the alleged violations of law. (Compl. ¶¶ 101, 103; AC ¶¶ 86, 88.)

17.     Counsel for MEDNAX responded to the June 27 letter on or about June 28, 2017, denying any violations of law. (Compl. ¶ 105; AC ¶ 91.) As a result of MEDNAX's refusal to satisfy the Individual Defendants' concerns, the Individual Defendants informed MEDNAX and SAC of their intent not to renew their Employment Agreements. (Compl. ¶ 114–115; AC ¶ 100–101.)

18. During the period from June 2017 through October 21, 2017, MEDNAX representatives allegedly made several attempts to negotiate, persuade, and intimidate the Individual Defendants to renew their Employment Agreements. (Compl. ¶¶ 121–126; AC ¶¶ 107–112.) These attempts included conversations by telephone and in person between the Individual Defendants and MEDNAX representatives, including Dr. Mason; Trey Long, Vice President of Operations of MEDNAX; and Mike Murphy, M.D., Chief Medical Officer of MEDNAX. (Compl. ¶ 125; AC ¶ 111.)

19. Becoming concerned that there would not be sufficient anesthesiologists available to Cone Health in order to operate at full capacity, the Individual Defendants organized a new entity, ACNC, which would be prepared to "step in" and provide anesthesiology services to Cone Health in the event that MEDNAX or SAC were unable to. (Compl. ¶¶ 127–128; ¶¶ 113–114.) On or about October 31, 2017, Cone Health and ACNC entered into an Interim Anesthesia Services Agreement (the "Interim Agreement") to provide Cone Health with anesthesiology services from November 1, 2017 through April 30, 2019. (Compl. ¶¶ 134–135; AC ¶¶ 120–121.)

20. After the creation of ACNC and execution of the Interim Agreement, MEDNAX filed multiple Demands for Arbitration against the Individual Defendants in amounts of $100,000,000.00 in an attempt to demand that the Individual Defendants work after October 31, 2017. (Compl. ¶¶ 119, 121, 138–141; AC ¶¶ 105, 107, 124–127.) Defendants allege that these demands were made to intimidate the Individual Defendants. (Compl. ¶¶ 138–141; AC ¶¶ 124–127.)

21.     Defendants contend that MEDNAX also interfered with the employment of two non-party anesthesiologists, Richard S. Guidetti, D.O. ("Dr. Guidetti") and Jennifer D. Allan, M.D. ("Dr. Allan"), who were previously employed by MEDNAX or SAC.  (Compl. ¶¶ 142, 145; AC ¶¶ 128, 131.)  Dr. Guidetti and Dr. Allan were informed by Cone Health, on or about November 19, 2017, that they retained hospital privileges and could continue work at Cone Health as ACNC employees.  (Compl. ¶ 142; AC ¶ 128.)  On or about November 20, 2017, Dr. Guidetti and Dr. Allan signed employment agreements with ACNC in order to provide anesthesia services at Cone Health.  (Compl. ¶ 143; AC ¶ 129.)

22.     On or about November 22, 2017, sometime after speaking to MEDNAX, Cone Health represented to ACNC that Cone Health wanted Dr. Guidetti and Dr. Allan taken off the schedule to provide anesthesia services at Cone Health.  (Compl. ¶ 144; AC ¶ 130.)  On or about December 4, 2017, counsel for Cone Health informed counsel for Dr. Guidetti and Dr. Allan that their privileges at Cone Health had been terminated and they would not be able to reapply for privileges until MEDNAX or SAC provided a release to Cone Health.  (Compl. ¶ 147; AC ¶ 133.)  MEDNAX refuses to provide a release to permit Dr. Guidetti and Dr. Allan to practice with ACNC; however, MEDNAX has agreed to provide a release to permit these physicians to practice with another group or organization within Greensboro.  (Compl. ¶ 148; AC ¶ 134.)  Defendants allege that MEDNAX threatened Cone Health with litigation if Dr. Guidetti and Dr. Allan were not removed from the schedule of anesthesiologists practicing at Cone Health.  (Compl. ¶ 145; AC ¶ 131.)

23.     Defendants aver that MEDNAX is attempting to re-obtain the Exclusive Agreement with Cone Health, "despite the fact that ACNC has such a contract." (Compl. ¶ 149; AC ¶ 135.)

## II.     PROCEDURAL BACKGROUND

24.     The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

25.     On December 13, 2017, SAC and MEDNAX Services filed their First Amended Complaint (Case No. 17 CVS 9002) against Dr. Rose, Dr. Fitzgerald, Dr. Hodierne, Dr. Joslin, Dr. Massagee, Dr. Ossey, Dr. Singer, ACNC, Rose Anesthesia, and Cone Health.   (ECF No. 3.)

26.     On January 31, 2018, Dr. Rose, Dr. Fitzgerald, Dr. Hodierne, Dr. Joslin, Dr. Massagee, Dr. Ossey, Dr. Singer, ACNC, Rose Anesthesia and Cone Health filed the Amended Motion to Dismiss, Answer and Counterclaim in Case No. 17 CVS 9002 (the "Amended Counterclaims").  (ECF. No. 18.)  Also, on January 31, 2018, the Individual Defendants filed a Complaint in Case No. 18 CVS 2955 against Plaintiffs[2].  (ECF No. 5.)

27.     This Court, on March 28, 2018, filed a Consolidation Order consolidating cases 17 CVS 9002 and 18 CVS 2955.  (ECF No. 37.)

28.     The Amended Counterclaims in Case No. 17 CVS 9002 and the claims in the Complaint in Case No. 18 CVS 2955 contain nearly identical factual allegations

---

[2] The Individual Defendants assert the Counterclaims against MEDNAX and Dr. Mason but only against SAC and AAI in the alternative "should the Court find that SAC is not a sham entity, created and controlled by MEDNAX[.]"

for the same causes of actions and are collectively referred to herein as the "Counterclaims." Each Counterclaim is brought by the Individual Defendants, Rose Anesthesia, and ACNC.

29. Plaintiffs filed the Motion on April 17, 2018 to dismiss the Counterclaims. The Motion has been fully briefed, and the Court held a hearing on the Motion on September 25, 2018, at which all parties were represented by counsel.

30. The Motion is ripe for resolution.

## III. LEGAL STANDARD

31. In ruling on a motion to dismiss under Rule 12(b)(6),[3] the Court reviews the allegations of the Counterclaims in the light most favorable to Defendants. The Court's inquiry is "whether, as a matter of law, the allegations of the [Counterclaims] . . . are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court accepts all well-pleaded factual allegations in the Counterclaims as true. *See Kraweic v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018).

32. The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620

---

[3] Plaintiffs also sought dismissal of Defendants' federal antitrust claim pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. However, the federal antitrust claim is no longer before this Court. Defendants filed a Notice of Voluntary Dismissal Without Prejudice of Federal Anti-Trust Claims Only on September 26, 2018 voluntarily dismissing the Federal Anti-Trust Claims under 15 U.S.C. § 1 *et seq.* without prejudice pursuant to Rule 41(a). (ECF No. 86.) Therefore, the Court does not further address Plaintiffs' 12(b)(1) Motion.

S.E.2d 873, 880 (2005) (citation omitted).  The Court can also ignore a party's legal conclusions set forth in its pleading.  *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

33.   Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) [a Counterclaim] on its face reveals that no law supports the . . . claim; (2) [a Counterclaim] on its face reveals the absence of facts sufficient to make a good claim; or (3) [a Counterclaim] discloses some fact that necessarily defeats. . . the claim.'"  *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).  This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation."  *Id.* at 737 n.7.

## IV.   ANALYSIS

34.   The Motion seeks dismissal of the Counterclaims against Plaintiffs for: (i) unjust enrichment and disgorgement; (ii) unfair and deceptive trade practices under N.C.G.S. § 75-1.1; (iii) violation of federal and state antitrust law; (iv) Racketeer Influenced and Corrupt Organizations Act violations under 18 U.S.C. § 1962 and N.C.G.S. § 75D; and (v) tortious interference with contract.

### A.   Claims Brought by Rose Anesthesia

35.   Rose Anesthesia only asserts claims against Plaintiffs in the Amended Counterclaims.  Defendants use the defined term "Defendants" throughout the Amended Counterclaims.   Asserting the Counterclaims against Plaintiffs,

Defendants state: "Defendants, by and through their undersigned counsel, hereby assert for their amended counterclaim against Plaintiffs[. . . .]" (AC 18.) The term "Defendants" is defined to include Dr. Rose, Dr. Fitzgerald, Dr. Hodierne, Dr. Joslin, Dr. Massagee, Dr. Ossey, Dr. Singer, Rose Anesthesia, and ACNC. (AC 1.)

36. Using this defined term "Defendants" would initially lead the Court to believe that Rose Anesthesia asserts claims against Plaintiffs. However, the Amended Counterclaims are completely devoid of any factual allegations showing any involvement of or injury incurred by Rose Anesthesia for the relevant times of this dispute. In fact, the Amended Counterclaims' only mention of Rose Anesthesia is the inclusion of the entity in the defined term and in the pleading's caption.

37. While the use of a defined term was likely chosen by Defendants in an effort to easily identify the parties, the defined term "Defendants" creates ambiguity in its inclusion of Rose Anesthesia because there is no other mention of Rose Anesthesia for the remainder of the Amended Counterclaims. Without a single factual allegation relating to, or even identifying, Rose Anesthesia, the Court does not interpret the Amended Counterclaims to assert any claims by Rose Anesthesia. However, to the extent Rose Anesthesia intends to set forth any claims against Plaintiffs, the Court GRANTS Plaintiffs' Motion dismissing any claims intended to be brought by Rose Anesthesia without prejudice.[4]

---

[4] The decision to dismiss an action with or without prejudice is in the discretion of the trial court. *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013). The Court concludes, in the exercise of its discretion, that dismissal of Rose Anesthesia's claims should be without prejudice.

### B. Unjust Enrichment

38. In order to sufficiently state a claim for unjust enrichment, a party must allege: "(1) it conferred a benefit on another party; (2) the other party consciously accepted the benefit; and (3) the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Worley v. Moore*, 2018 NCBC LEXIS 114, at *25 (N.C. Super. Ct. Nov. 2, 2018) (citing *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002)). As an alternative to a breach of contract claim, "[o]nly in the absence of an express agreement of the parties will courts impose a quasi-contract or contract implied in law in order to prevent an unjust enrichment." *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998); *Worley*, 2018 NCBC LEXIS 114, at *24–25 (quotation marks and citations omitted).

39. Defendants allege that the Individual Defendants negotiated with MEDNAX for SAC's purchase of GAP and immediately following the purchase, MEDNAX raised its rates by approximately thirty percent, so that the negotiated Employment Agreements "were no longer accurate or relevant." (Compl. ¶¶ 42–48, 61–64; AC ¶¶ 28–35, 47–50.) Defendants further allege that MEDNAX received "tens of millions of dollars" from the work of the Individual Defendants between November 1, 2010 and October 31, 2017. (Compl. ¶ 153; AC ¶ 139.) Furthermore, Defendants allege that the Individual Defendants conferred a benefit to MEDNAX by providing anesthesiology services to Cone Health pursuant to the Exclusive Agreement and the

Individual Defendants expected to receive a certain percentage of the fees charged to Cone Health. (Compl. ¶¶ 152, 157; AC ¶¶ 138, 143.)

40. Plaintiffs contend that because the Individual Defendants provided services pursuant to the Employment Agreements and because Defendants do not allege that Plaintiffs failed to pay sums owed thereunder, there can be no claim for unjust enrichment. (Br. Supp. Mot. to Dismiss 6–7, ECF No. 52 ["Br. Supp."]; SAC-Aligned Parties' Reply Br. Further Supp. Mot. to Dismiss 3, ECF No. 73 ["Reply Br."].) While Defendants advance claims based on the Employment Agreements, an alleged contractual relationship does not bar a claim for unjust enrichment at the pleadings stage. *See Blue Ridge Pediatric & Adolescent Med., Inc. v. First Colony Healthcare, LLC*, 2012 NCBC LEXIS 52 at *34 (N.C. Super. Ct. Sept. 4, 2012) (providing that the plaintiffs could still state a claim for unjust enrichment even when a lease was at issue, which required the plaintiffs to pay defendants rent in excess of fair market value); *Worley*, 2018 NCBC LEXIS 114, at *24–27 (concluding that the plaintiff sufficiently pled an unjust enrichment claim even when the benefit conveyed to the defendants was the transfer of the plaintiffs' stock and the consent to a merger with the defendants, which was conferred pursuant to a merger agreement).

41. Plaintiffs further contend that MEDNAX's increased rates, which were put in place in November of 2010, cannot serve as the basis for an unjust enrichment claim because such a claim would be time barred by the statute of limitations. (Br. Supp. 8; Reply Br. 3–4.) "A statute of limitations. . . defense may be raised by way of a motion to dismiss if it appears on the face of the complaint that such a statute bars

the claim." *Hargett v. Holland*, 337 N.C. 651, 653, 447 S.E.2d 784, 786 (1994) (citations omitted). "An unjust enrichment claim is governed by the three-year statute of limitations of [N.C.G.S.] § 1-52(1)." *Lockerman v. S. River Elect. Membership Corp.*, 2015 NCBC LEXIS 60, at *22–23 (N.C. Super. Ct. June 8, 2015). "The discovery rule does not apply to an unjust enrichment claim." *Lau v. Constable*, 2017 NCBC LEXIS 10, at *13 (N.C. Super. Ct. Feb. 7, 2017).

42. The Individual Defendants' unjust enrichment claims are premised on both the actions taken by Plaintiffs in their alleged efforts to enforce the Employment Agreements and alleged illegal fee-splitting occurring from November 1, 2010 until October 31, 2017. (*See* Compl. ¶¶ 153–158; AC ¶¶139–144.) Only some of the Individual Defendants were once GAP physicians and signed the Employment Agreements in November 2010. (Compl. ¶ 32; AC ¶ 18.) However, due to a lack of specificity in the Defendants' pleading, it is unclear which of the Individual Defendants were GAP physicians and which were not. Each of the Individual Defendants who were not GAP physicians signed employment agreements with SAC at some unspecified time after November 1, 2010. (Compl. ¶ 41; AC ¶ 55.) Therefore, it is unclear from the face of the pleadings when each Individual Defendant's unjust enrichment claim accrued.

43. Drawing all reasonable inferences in the light most favorable to the Individual Defendants, Plaintiffs' conduct occurring as late as October 2017 could serve as the basis for the unjust enrichment claim. (Compl. ¶ 153; AC ¶ 139.) Accordingly, there is no deficiency obvious on the face of the Counterclaims that

indicates that all of the Individual Defendants' claims for unjust enrichment are necessarily time barred, or even which of the Individual Defendants may be time barred. *See Shallotte Partners, LLC v. Berkadia Commercial Mortg., LLC*, No. COA15-89, 2015 N.C. App. LEXIS 561, at *30 (N.C. Ct. App. 2015) (denying a motion to dismiss when it was "unclear" from the face of the complaint precisely when the wrongdoings occurred).

44.     The Court DENIES Plaintiffs' Motion to dismiss the unjust enrichment claim brought by the Individual Defendants.   However, as a factual matter, Defendants fail to allege any benefit conferred by ACNC to Plaintiffs.  Therefore, the Court GRANTS Plaintiffs' Motion as to ACNC's claim for unjust enrichment.

## C.     Disgorgement

45.     Disgorgement is a remedy, not a cause of action.  *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 159, at *39–40 (N.C. Super. Ct. Nov. 29, 2018).  "Disgorgement of profits is a relief in the nature of restitution." *SAS Inst., Inc. v. World Programming Ltd.*, 2015 U.S. Dist. LEXIS 199240, at *2 (E.D.N.C. Sept. 8, 2015).  Restitution may be awarded when a party brings a claim under theories of quasi-contract or contract implied-in-law, such as unjust enrichment.  *Id.*; *Booe v. Shadrick*, 322 N.C. 567, 570; 369 S.E.2d 554, 555 (1988) ("[An unjust enrichment claim] is described as a claim in quasi contract or a contract implied in law.").

46.     Although the Court concludes that disgorgement is not a cause of action, the Court has already determined that Defendants have sufficiently stated a claim for unjust enrichment, which may permit the Individual Defendants to seek

disgorgement as a remedy. As such, the Court GRANTS Plaintiffs' Motion as to the disgorgement cause of action; however, this Order does not preclude Defendants from seeking disgorgement as a remedy for any remaining claims for which it is an appropriate remedy. *See HSG, LLC v. Edge-Works Mfg. Co.*, 2015 NCBC LEXIS 91, at *16 (N.C. Super. Ct. Oct. 5, 2015) (permitting the plaintiff's voluntarily dismissal of a claim for disgorgement of profits, without waiving its right to seek disgorgement of profits as a remedy to any claim going forward).

### D.      Unfair and Deceptive Trade Practices

47.      To state a claim for unfair and deceptive trade practices pursuant to N.C.G.S. §75-1.1 (the "UDTPA"), Defendants must allege "(1) [Plaintiffs] committed an unfair and deceptive trade practice, (2) in or affecting commerce, and (3) [Defendants were] injured as a result." *McKee v. James*, 2013 NCBC LEXIS 33, at *31 (N.C. Super. Ct. July 24, 2013) (quotation marks and citation omitted).

48.      The UDTPA provides that commerce "includes all business activities, however denominated[,]" however, N.C.G.S. §75-1.1(b) expressly does not include "professional services rendered by a member of a learned profession" (the "Learned Profession Exception").

49.       Plaintiffs seek dismissal of Defendants' UDTPA claim for one reason: Plaintiffs contend that SAC, MEDNAX, AAI, and Dr. Mason all fall within the Learned Profession Exception. (Br. Supp. 10–12; Reply Br. 6–7.)

50.      To determine whether this exception applies, the Court must conduct a two-part inquiry: "(1) the entity or person whose conduct is being challenged must be a

member of a learned profession, and (2) the challenged conduct must constitute a rendering of professional services." *Sykes v. Health Network Sols, Inc.*, 828 S.E.2d 467, 472 (N.C. 2019); *Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 589, 768 S.E.2d 119, 123 (2014).

51.     It is well established under North Carolina law that medical professionals fall within the Learned Profession Exception. *Shelton v. Duke Univ. Health Sys.*, 179 N.C. App. 120, 126, 633 S.E.2d 113, 117 (2006). For the purposes of N.C.G.S. § 75-1.1(b), the term "medical professionals", including both entities and individuals, has been broadly defined by the courts. *Shelton*, 179 N.C. App. at 126, 633 S.E.2d at 117; *Alamance Family Practice, P.A. v. Lindley*, 2018 NCBC LEXIS 83, at *22 (N.C. Super. Ct. Aug. 14, 2018).

52.     Defendants argue that Plaintiffs cannot benefit from the Learned Profession Exception because MEDNAX is not a member of a learned profession but is a corporate entity that provides administrative support for members of a learned profession and Plaintiffs' alleged misconduct was not done while practicing medicine. (Anesthesiology Defs'. Memo. Law Opp. SAC-Aligned Parties' Mot. Dismiss, 11–13, ECF No. 65 ["Memo. Opp."].)

53.     In *Sykes v. Health Network Sols, Inc.*, 2017 NCBC LEXIS 73, at *54–55 (N.C. Super. Ct. Aug. 18, 2017), this Court held that the defendant Health Network Solutions, Inc. ("HNS"), a North Carolina corporation, managed a network of chiropractors. *Sykes*, 2017 NCBC LEXIS 73, at *8. Licensed chiropractors became members of HNS in order for HNS to negotiate with insurance companies to establish

reimbursement rates for the network's members. *Id.* at \*9–10. HNS then processed all reimbursement claims for the chiropractors and received a percentage of those payments. *Id.* at \*9. All of the members and the owners of HNS were licensed chiropractors. *Sykes v. Health Network Sols., Inc.*, 828 S.E.2d at 469 (N.C. 2019).

54. On appeal from this Court's ruling, the North Carolina Supreme Court affirmed the trial court's determination that HNS was a member of a learned profession for the purposes of the UPTPA. *Id.* at 473.

55. The Court discerns no reason that it should reach a different conclusion concerning MEDNAX, SAC, AAI, and Dr. Mason here. As a licensed physician, Dr. Mason is a member of a learned profession. *See Sykes,* 828 S.E.2d at 473 (exempting licensed chiropractors). Analogous to HNS, SAC and AAI are wholly owned by Dr. Mason, a licensed physician, who is also the sole member of both entities. (Compl. ¶ 30; AC ¶ 16.) SAC employed anesthesiologists and assumed the contract with Cone Health to be the exclusive provider of anesthesiology services to Cone Health's patients. (Compl. ¶¶ 33, 53; AC ¶¶ 19, 39.) All of the alleged unfair and deceptive conduct by MEDNAX and AAI is alleged to have been accomplished through its "control" of SAC as an anesthesiology services provider. (Compl. ¶¶ 164–172, 209–218; AC ¶¶ 150–159.) Therefore, SAC, AAI, and MEDNAX as owners or controllers of an anesthesiology services provider, which employs licensed anesthesiologists to provide services to hospital patients, are members of a learned profession.

56. Having determined this threshold issue, the Court next turns to whether the conduct that serves as the basis of Defendants' UDTPA claim is the "rendering of

professional services." *Wheeless*, 237 N.C. App. at 589, 768 S.E.2d at 123. Defendants argue that, because the alleged misconduct did not occur while the Plaintiffs were actively practicing medicine, Defendants may not benefit from the Learned Profession Exception. (Memo. Opp. 12.) However, Defendants' argument is not supported by North Carolina law; there is no requirement that a member of a learned profession under section 75-1.1 be actively engaged in the practice of medicine.

57. The Learned Profession Exception covers a broad range of conduct, including matters "affecting the professional services rendered by members of a learned profession." *Wheeless*, 237 N.C. App. at 590, 768 S.E.2d at 123; *Shelton,* 179 N.C. App. at 126, 633 S.E.2d at 117 (excluding a hospital for the purported misconduct related to its billing practices for uninsured patients). Furthermore, the exception has been held to apply to alleged unfair and deceptive conduct involving, like here, allegedly "anticompetitive conduct involving commercial activity." *See Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C App. 414, 446–47, 293 S.E.2d 901, 920–21 (1982) (excluding a hospital's conduct in denying hospital staff privileges to a physician); *Alamance Family Practice, P.A.*, 2018 NCBC LEXIS 83, at *22–27 (excluding a nurse practitioner for purportedly illegally obtaining patient data, using that data to solicit the plaintiff's patients, paying unauthorized personal expenses, and attempting to give kickbacks for referrals); *Wheeless*, 237 N.C. App. at 590, 768

S.E.2d at 119 (excluding the defendant medical park board for alleged misconduct in filing an anonymous medical board complaint).

58. Defendants allege that Plaintiffs' conduct in (1) misappropriating funds through the operation of anesthesia services; (2) deceiving Defendants in the negotiations and execution of the Purchase Agreement and Employment Agreements; and (3) exercising dominion and control over SAC and Dr. Mason in order to "operate medical practices" within the State of North Carolina violate UDTPA. (Compl. ¶¶ 164–172; AC ¶¶ 150–158.) Defendants allegations that Plaintiffs used SAC in order to "operate medical practices" and "misappropriated [tens of millions of dollars] through the operation of anesthesia services" necessarily places Plaintiffs squarely within the Learned Profession Exception. (Compl. ¶ 168; AC ¶ 155.) Determining that any of the alleged misconduct falls within the Learned Profession Exception would be no broader than application of the exception in the aforementioned cases.

59. The Court concludes that the facts as alleged by Defendants cannot support a claim under UDTPA because MEDNAX, SAC, AAI, and Dr. Mason fall into the Learned Profession Exception. Plaintiffs' Motion to dismiss the unfair and deceptive trade practices claim is GRANTED and Defendants' claim under section 75-1.1 is hereby DISMISSED.

**E.    Antitrust Claims**

60. Dismissal of an antitrust claim "at the pre-discovery, pleading stage [is] . . . generally limited to certain types of glaring deficiencies." *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2017 NCBC LEXIS 33, at *46 (N.C. Super. Ct. Apr. 11,

2017) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011). However, even North Carolina's lenient pleading standard does not allow for an antitrust claim to continue when there are insufficient or conclusory allegations of market power. *See Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at *29–30 (N.C. Super. Ct. June 14, 2016).

61. In order to proceed on an antitrust claim, the claimant must define the relevant market.[5] *DiCesare*, 2017 NCBC LEXIS 33, at * 47. Defendants contend that the relevant market for examination of Plaintiffs' alleged wrongdoing is the provision of hospital anesthesia services. (Compl. ¶ 74; AC ¶ 60.) Defendants define hospital anesthesia services to include all anesthesia related services for in-patient and out-patient procedures performed in hospitals, not including procedures performed in a non-hospital setting. (Compl. ¶¶ 75–76; AC ¶¶ 61–62.) Defendants allege that virtually no surgical procedure can take place without anesthesia services and the highly specialized services provided by anesthesiologists cannot be provided by other physicians. (Compl. ¶¶ 80, 82; AC ¶¶ 66, 68.)

62. Defendants contend that the relevant geographic market is comprised of hospitals in Greensboro, its surrounding counties, and counties in southern Virginia. (Compl. ¶¶ 74–78; AC ¶¶ 60–64.) Defendants allege that Cone Health operates all of the hospitals within Greensboro, North Carolina. (Compl. ¶ 78; AC ¶ 64.) Defendants also allege that patients from surrounding "rural" counties including Alamance,

---

[5] The Court does not address whether Defendants sufficiently identified the relevant product and geographic markets. For purposes of the Motion, Plaintiffs do not dispute the defined market set forth by Defendants nor is any definition set forth by Defendants determinative in the disposition of the Motion for the reasons discussed herein.

Davidson, Caswell, Rockingham, and Stokes Counties in North Carolina and Patrick, Henry, and Pittsylvania Counties in Virginia travel to Cone Health for healthcare because hospitals in these counties are not of the same size and do not have the same offering of extensive and specialized services as Cone Health. (Compl. ¶ 78; AC ¶ 64.)

63. Finally, Defendants allege that the Exclusive Agreement gave MEDNAX or SAC a complete monopoly over the market. (Compl. ¶ 85; AC ¶ 71.)

### 1. Restraint of Trade Claims

64. To establish a claim for restraint of trade under North Carolina law, a party must plead "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *DiCesare*, 2017 NCBC LEXIS 33, at *44 (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002)). North Carolina's highest court has noted that federal decisions applying the Sherman Act are instructive in determining the full reach of N.C.G.S § 75-1. *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655 194 S.E.2d 521, 530 (1973) ("[T]he body of law applying the Sherman Act, although not binding upon this Court in applying [N.C.G.S.] § 75-1, is nonetheless instructive in determining the full reach of the statute."); *see also Patel v. Scotland Mem'l Hosp.*, 1995 U.S. Dist. 5258, at *19 (M.D.N.C. Mar. 31, 1995) ("[T]he reasons supporting dismissal . . . under § 1 of the Sherman Act apply equally to [claims] under North Carolina antitrust law."); *Cameron*, 58 N.C. App. at 442, 293 S.E. 2d at 918.

65. Resolving a North Carolina anti-trust claim, the court in *Cole v. Champion Enterprises*, 496 F. Supp. 2d 613, 634 (M.D.N.C. 2007) provided that whether a

restraint of trade in the form of a non-compete agreement is unreasonable is determined by applying the rule of reason. The threshold question in determining whether a restraint of trade claim evaluated by a rule of reason inquiry may go forward is "whether the [Plaintiffs] had market power in the relevant product and geographic market." *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002) (quotation marks omitted).

66. "Market power is the ability to raise prices above the levels that would be charged in a competitive market." *Id.* at 381. "Direct proof of market power requires evidence of restricted output and supracompetitive prices." *DiCesare*, 2017 NCBC LEXIS 33, at *48 (citing *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 381.) Market power may also be evidenced circumstantially by showing a dominant share of the market or significant barriers to entry. *Id.*

67. Plaintiffs correctly assert that the only grounds on which Defendants rest their claims for restraint of trade is the enforcement of the Non-Compete Agreements. (*See* Compl. ¶¶ 173–183; AC ¶¶ 160–170.) The question as to whether non-compete agreements are reasonable and whether non-compete agreements violate antitrust laws are not governed by the same standard. *Cole,* 496 F. Supp. 2d at 635. "[E]ven an unreasonable covenant not to compete does not necessarily violate [North Carolina's] antitrust laws; to constitute such a violation, there must be an adverse effect on the relevant market." *Id.* Allegations that the Non-Compete Agreements are contrary to public policy, which may support another cause of action, are insufficient on their own to support a restraint of trade claim. *See Oksanen v. Page*

*Mem'l Hosp.*, 945 F.2d 696, 711 (4th Cir. 1991) ("The antitrust laws were not intended . . . as a vehicle for converting business tort claims into antitrust causes of action.").

68. Defendants have not made any factual allegations that support a finding that Plaintiffs dominate the market, have created significant barriers to entry, or restrict output levels in the market. The only allegations by Defendants to support a claim for restraint of trade are that "[b]y obtaining exclusive contracts in multiple cities within North Carolina, MEDNAX is able to control the costs of services [,]" (Compl. ¶ 181; AC ¶ 168); and "[a]fter obtaining the exclusive anesthesia contract with Cone Health System, costs for hospital anesthesia services were raised thirty percent (30%) in the Geographic Market[,]" (Compl. ¶ 181; AC ¶ 168). Defendants assert that the values received by MEDNAX over a span of seven years were "in excess of the value of the administrative support purportedly provided" and allege that MEDNAX expected "large sums" from the work of the Individual Defendants. (Compl. ¶¶ 153–154; AC ¶¶ 139–140.) Allegations that MEDNAX charged prices that were higher than the costs of providing administrative support is insufficient to allege supracompetitive prices. *See R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 382 (providing that allegations of "artificially high" prices and that prices are "higher than necessary" are insufficient on their own to establish supracompetitive prices).

69. This Court has previously recognized that granting a motion to dismiss pursuant to Rule 12(b)(6) for a section 75-1 claim is generally reserved for glaring deficiencies. *DiCesare*, 2017 NCBC LEXIS 33, at *46 (citing *E.I. du Pont de Nemours & Co.*, 637 F.3d at 444). However, the Counterclaims are devoid of any factual

allegations to support a conclusion that Plaintiffs possessed market power as required for a claim under this statute. For this reason, therefore, Defendants' restraint of trade claim is hereby DISMISSED.

70. Even if the Court assumes that Defendants put forward sufficient factual allegations to show market power, Defendants' claim under section 75-1 still must fail because Defendants do not allege an antitrust injury. Defendants' pleading must include factual allegations of conduct that harms the competitive process in order to sufficiently state a restraint of trade claim. *See DiCesare*, 2017 NCBC LEXIS 33, at *48 (quoting *Dickson,* 309 F.3d at 206). Defendants must allege more than an injury to themselves, even "[h]arm to one or many competitors will not suffice." *Dickson*, 309 F.3d at 206; *Cole*, 496 F. Supp. 2d at 634. That Defendants have failed to do so here is fatal to their claim, providing a further basis for dismissal.

71. When a restraint of trade claim is based on the provision of medical services, the failure to allege "injury to competition in the form of increased cost, reduced supply of services, or harm to the patient[s]" may warrant dismissal under Rule 12(b)(6). *See Patel*, 1995 U.S. Dist. LEXIS 5258 at *17 (citing *Lie v. St. Joseph Hosp. of Mt. Clemens, Mich.*, 964 F.2d 567, 570 (6th Cir. 1992). Defendants fail to allege any actual harm done to patients or reduced supply of services and only present the Court with hypothetical harms that could result *if* the Non-Compete Agreements were enforced. Accordingly, Defendants have failed to allege an antitrust injury and,

for this separate and independent reason, Defendants' restraint of trade claim is DISMISSED.

### 2.     Monopolization Claims

72.     N.C.G.S. § 75-2.1 makes it "unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce in the State of North Carolina." "[A] monopolization violation consists of two elements: (1) the possession of monopoly power in the relevant market, and (2) willful maintenance of that power." *DiCesare*, 2017 NCBC LEXIS 33 at \*53–54 (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 441).

73.     The same practices may evidence both a violation of N.C.G.S. § 75-1's prohibition on restraint of trade and N.C.G.S § 75-2.1's prohibition on monopolization. *Dickson*, 309 F.3d at 202.  However, "monopoly power is a higher degree of power than market power." *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 394.

74.     At the pleading stage, courts have required a threshold showing of market share in the relevant market before a party may proceed with a monopolization claim. *Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at \*29.  Generally, seventy percent (70%) to seventy-five percent (75%) market share is necessary to sustain a monopolization claim and thirty percent (30%) to fifty (50%) is presumed necessary to sustain a claim for attempted monopolization. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992); *Advanced Health-*

*Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990); *Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at *29.

75.    Defendants define the market as the provision of all anesthesia-related services for in- and out-patient procedures performed in hospitals in Greensboro, North Carolina and the surrounding counties, some of which stretch into Virginia.[6] (Compl. ¶¶ 74–77; AC ¶¶ 60–63.)  Defendants allege that ACNC currently has an exclusive contract with Cone Health.  (Compl. ¶ 149; AC ¶ 135.)  Defendants further allege that Cone Health operates "all of the hospitals within Greensboro" and that many patients in Greensboro's surrounding counties seek treatment at Cone Health. (Compl. ¶ 78; AC ¶ 64.)  Taking these factual allegations as true, Plaintiffs cannot possibly maintain monopoly power over the market when ACNC currently has the exclusive contract with Cone Health, the operator of all of the hospitals in Greensboro.  Furthermore, Defendants do not allege that Plaintiffs currently possess any monopoly power.  While this Court need not and does not determine a minimum market share that must be pled for a § 75-2.1 claim to survive a Rule 12(b)(6) motion, a party must make factual allegations evidencing monopoly power and supporting a finding of market share exceeding zero percent (0%) to state a claim for monopolization, which Defendants have failed to do here.

76.    Even if the Court were to interpret Defendants' claim as one for attempted monopolization, Defendants' factual allegations remain insufficient under Rule

---

[6] The Court does not analyze the sufficiency of Defendants' pleading as it relates to defining the relevant market, as it is not necessary or outcome determinative for the purposes of this Motion.

12(b)(6). Attempted monopolization "employs methods, means and practices which would, if successful, accomplish monopolization, and which though falling short, nevertheless approach so close as to create a dangerous probability of it." *M & M Med. Supplies & Serv. Inc.*, 981 F.2d at 166. "To state a claim for attempted monopolization [under section 2 of the Sherman Act], a claimant must plead: (1) the use of anticompetitive conduct, (2) with specific intent to monopolize, and (3) a dangerous probability of success." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 453; *Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at *52 (considering federal law for the resolution of a North Carolina monopolization claim).

77.     While Defendants allege that Plaintiffs are currently seeking the exclusive contract with Cone Health, Defendants fail to allege any market share possessed by Plaintiffs in the relevant market or a dangerous probability of success of acquiring market share. *M & M Med. Supplies & Serv., Inc.*, 981 F.2d at 168 ("[A] dangerous probability of success, must be shown to be substantial and real."); *Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at *29 ("[A] market-share range between 30% and 50% is presumed necessary to sustain a claim for attempted monopolization."). To the contrary, Defendants allege that Cone Health's representative stated that to exclusively contract with the remaining MEDNAX and SAC anesthesiologists would be "virtually undoable" and "untenable" unless Cone Health opted to close a hospital. (Compl. ¶ 130; AC ¶ 116.) Defendants also allege that MEDNAX and SAC were unable to replace the Individual Defendants, further indicating that there is no

probability of Plaintiffs successfully acquiring the market share MEDNAX or SAC once possessed by the exclusive contract with Cone Health.  (Compl. ¶ 83; AC ¶ 69.)

78.    As such the Court GRANTS Plaintiffs' Motion to dismiss both the restraint of trade claim pursuant to N.C.G.S. § 75-1 and the monopolization claim pursuant to N.C.G.S. § 75-2.1.

**F.    Racketeer Influenced and Corrupt Organizations Act Claim**

79.    Defendants allege violations of both the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. § 1962, and the North Carolina RICO statute pursuant to N.C.G.S. § 75D.  (Compl. ¶ 179; AC ¶ 192.)

**1.    Federal RICO Statute**

80.    To state a civil RICO claim, Defendants must allege that Plaintiffs "engaged in, or conspired to engage in, a pattern of racketeering activity." *US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quotation marks omitted).  "Pattern of racketeering activity" is defined by 18 U.S.C. § 1961(5) as at least two acts of racketeering activity occurring within ten years of each other. *Rotella v. Wood*, 528 U.S. 549, 552 (2000); *US Airline Pilots Ass'n*, 615 F.3d at 318. Predicate acts that form the basis of a racketeering claim are defined broadly by 18 U.S.C. § 1961 to include specifically enumerated violations of several federal statutes. RICO, however, does not cover all instances of wrongdoing but is limited to "organized, long-term, habitual criminal activity." *Southwood v. Credit Card Sol.*, 2012 U.S. Dist. LEXIS 152146, at *32–33 (E.D.N.C. Oct. 23, 2012); *Gentile v.*

*Brunswick Cty. Sheriff's Dep't*, 2014 U.S. Dist. LEXIS 45310, at *26 (E.D.N.C. Jan. 23, 2014) (quoting *US Airline Pilots Ass'n,* 615 F.3d at 317).

81.     Defendants allege two distinct categories of predicate acts: (1) violations of N.C.G.S. § 55B; and (2) fraud. (Compl. ¶ 188; AC ¶ 175.)  Defendants contend that Plaintiffs violated N.C.G.S. § 55B by participating in the corporate practice of medicine and illegal fee splitting. (Compl. ¶ 187; AC ¶ 174.)  Defendants further contend that Plaintiffs committed mail and wire fraud.  (Compl. ¶ 189; AC ¶ 176.) The Court addresses each category in turn.

82.     First, Defendants fail to provide any binding legal authority that supports RICO extending to a violation of N.C.G.S. § 55B.  The broad coverage of 18 U.S.C. § 1961 does not include the unauthorized practice of medicine, a violation of N.C.G.S. § 55B, or any similar statutes, in its long list of specifically enumerated predicate acts.  The Court declines to interpret the definition of racketeering to be so expansive as to include predicate acts comprised of violations of N.C.G.S. § 55B and any alleged violation of this statute as set forth by Defendants cannot serve as the basis for a RICO claim.  *Salami v. JPMorgan Chase Bank, N.A.*, 2019 U.S. Dist. LEXIS 102410, at *9–10 (M.D.N.C. June 19, 2019) ("Only an offense listed in § 1961(1) can serve as a predicate offense sufficient to give rise to RICO liability." (citations omitted)).

83.     Defendants also assert that Plaintiffs committed both mail and wire fraud, which together may serve as the predicate acts for a federal RICO violation.  18 U.S.C. § 1961.  The mail and wire fraud statutes prohibit similar behavior and share elements requiring Defendants to plead "(1) a scheme disclosing an intent to defraud;

and (2) the use, or causing the use, respectively of the mails or interstate wires in furtherance of the scheme." *Southwood*, 2012 U.S. Dist. LEXIS 152146, at *35–36 (citing *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 233 (4th Cir. 2004)).

84.     When the predicate act of a RICO claim sounds in fraud, Defendants need not plead reliance; however, the predicate acts must be pled with particularity as required by F.R.C.P. 9(b). *Chubirko v. Better Bus. Bureau of Southern Piedmont, Inc.*, 763 F. Supp. 2d 759, 766–67 (W.D.N.C. 2011); *Barefoot v. Sec. Credit Corp.*, 2008 U.S. Dist. LEXIS 92319 at *11 (E.D.N.C. Nov. 12, 2008).

85.     Defendants allege that "[t]he acts of mail fraud and wire fraud include the June 28, 2017 letter and multiple phone communications by Trey Long and/or Eric Mason" to Defendants. (Compl. ¶ 189; AC ¶ 176.)  Aside from this legal conclusion, the Defendants make no other factual allegations suggesting that the referenced communications were fraudulent.  Defendants fail to make any allegations regarding the contents of the phone conversations purportedly serving as the basis of wire fraud, and although providing the contents of the letter, make no allegations permitting a conclusion that the letter is fraudulent.  Furthermore, Defendants provide no facts supporting that either the phone conversations or the letter was done in furtherance of any scheme by Plaintiffs to defraud Defendants.  Defendants simply rely on the recitation of elements of a fraud claim and assert legal conclusions, neither of which serve as a proper basis for a RICO claim.  *See Radcliffe v. Avenel Homeowners Ass'n*, 248 N.C. App. 541, 572, 789 S.E.2d 893, 913 (2016) ("[C]onclusory allegations that

track the elements of [a RICO] claim . . . alone are insufficient to state a legally sufficient claim[.]")

86. Accordingly, the Court GRANTS Plaintiffs' Motion to dismiss the federal RICO claim brought pursuant to 18 U.S.C. § 1964.

### 2. North Carolina RICO Statute

87. The North Carolina RICO statute prohibits any person from engaging in a pattern of racketeering activity or conducting or participating in an enterprise through a pattern of racketeering activity. N.C.G.S. § 75D-4(a). A "pattern of racketeering activity" is defined as "at least two incidents of racketeering activity [with] the same or similar purposes, results, accomplices, or methods. . ." within a four-year period. *Id.* § 75D-3(b).

88. In order to state a claim pursuant to North Carolina's RICO Act:

> (1) an innocent person must allege (2) an injury or damage to his business or property (3) by reason of two or more acts of organized unlawful activity, or conduct, (4) one of which is something other than mail fraud [or] wire fraud . . . (5) that resulted in pecuniary gain to the defendant[s].

*Gilmore v. Gilmore*, 229 N.C. App. 347, 356, 748 S.E.2d 42, 49 (2013) (citation and quotation marks omitted).

89. "Racketeering activity" is defined by N.C.G.S. § 75D-3(c)(1) as:

> to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit an act or acts which would be chargeable by

indictment if such act or acts were accompanied by the necessary mens rea or criminal intent[.]

N.C.G.S. § 75D-3(c)(1) also specifically enumerates violations of specific statutes, incorporating by reference the federal RICO statute, which may serve as a predicate act.

90.     By the express language of the statute, allegations of mail and wire fraud, without any other activity to serve as a predicate act, is insufficient to support a state RICO claim. *See Southwood*, 2016 U.S. Dist. LEXIS 48039, at *80–81; *Capps v. Blondeau*, 2010 NCBC LEXIS 11, at * 21 (N.C. Super. Ct. Apr. 13, 2010).

91.     N.C.G.S. § 75D-3(c)(1) and 18 U.S.C. § 1961 do not specifically enumerate a violation of N.C.G.S. § 55B as a predicate act.  Defendants have done no more than allege wire and mail fraud, which, without alleging another predicate act recognized under North Carolina law, is insufficient to state a claim pursuant to North Carolina's RICO statute.  *Southwood*, 2016 U.S. Dist. LEXIS 48039, at *80–81.  The Court therefore GRANTS Plaintiffs' Motion to dismiss the state RICO claim.

### G.     Tortious Interference with Contract

92.     Defendants allege that Plaintiffs tortiously interfered with the contract between ACNC and Cone Health System and the agreements between ACNC and Dr. Allan and Dr. Guidetti (collectively the "ACNC Agreements").  (Compl. ¶¶ 196–203; AC ¶¶ 183–89.)

93.     To state a claim for tortious interference with contract, a party must allege

(1) a valid contract [exists] between the plaintiff and a third-person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant

intentionally induces the third person not to perform the contract; (4) and in doing so acts with justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). An act lacks justification when it is done for a wrongful purpose, which "exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interest . . . involved." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220, 367 S.E.2d 647, 650 (1988).

94.    North Carolina law is "less-than-clear" as to when an interference is justified by a legitimate business interest. *K & M Collision, LLC, v. N.C. Farm Bureau Mut. Ins. Co.*, 2017 NCBC LEXIS 109, at *21 (N.C. Super. Ct. Nov. 21, 2017). "[D]ismissal at the pleading stage is inappropriate where questions of fact remain as to [Plaintiffs'] justification for interfering with [Defendants'] business relations." *Id.* at *23.

95.    Defendants plead two plausible motives for Plaintiffs alleged interference with the ACNC Agreements: (1) enforcement of the Non-Compete Agreements; and (2) the "malicious and non-business purpose of causing harm to ACNC" through threatened litigation. (Compl. ¶¶ 68–70, 199; AC ¶¶ 54–56, 186.)

96.    Plaintiffs challenge Defendants' claim of tortious interference of contract on the sole ground that any interference by Plaintiffs was justified. (Br. Supp. 26–28;

Reply Br. 11–13.) Determination of Plaintiffs' motive in the alleged interference and whether any interference was reasonably related to a protectable business interest is a fact-intensive inquiry. *See K & M Collision, LLC*, 2017 NCBC LEXIS 109, at \* 26–27. The Court concludes that it is premature to dismiss Defendants' claims for tortious interference with contract at the 12(b)(6) stage. As such, the Court DENIES Plaintiffs' Motion as to ACNC's tortious interference of contract claim.

97. Defendants fail to allege a valid contract, or any contract at all, that the Individual Defendants entered into that Plaintiffs attempted to or in fact interfered with; therefore, the Court GRANTS Plaintiffs' Motion as to the tortious interference of contract claims brought by the Individual Defendants.

## V.     CONCLUSION

98. **THEREFORE**, for the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as follows:

A.  The Motion is **GRANTED** as to any claims brought by Rose Anesthesia and any such claims are dismissed **without prejudice.**

B.  The Motion is **DENIED** as to the Individual Defendants' claim for unjust enrichment. The Motion is **GRANTED** as to ACNC's claim for unjust enrichment, which claim is dismissed with prejudice.

C.  The Motion is **GRANTED** as to Defendants' claim for disgorgement, which claim is dismissed with prejudice.

D.    The Motion is **GRANTED** as to Defendants' claim for unfair and deceptive trade practices which claim under section 75-1.1 is dismissed with prejudice.

E.    The Motion is **DENIED** as MOOT as to Defendants' federal antitrust claim under 15 U.S.C. § 1 *et seq*. The Motion is **GRANTED** as to Defendants' state antitrust claims, which claims are dismissed with prejudice.

F.    The Motion is **GRANTED** as to Defendants' RICO claims under both federal and state law, which claims are dismissed with prejudice.

G.    The Motion is **DENIED** as to ACNC's tortious interference of contract claim. The Motion is **GRANTED** as to the tortious interference of contract claims brought by the Individual Defendants, and those claims are dismissed with prejudice.

    **SO ORDERED**, this the 10th day of October, 2019.

/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases